[947 NE2d 620, 922 NYS2d 846]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MICHAEL SPICOLA, Appellant.

Argued February 17, 2011; decided March 31, 2011

## POINTS OF COUNSEL

*Lipsitz Green Scime Cambria, LLP,* Buffalo *(Paul J. Cambria, Jr., Roger W. Wilcox, Jr.,* and *Timothy P. Murphy* of counsel), for appellant. I. The introduction of improper child sexual abuse accommodation syndrome (CSAAS) testimony denied appellant his state and federal constitutional rights to a fair trial. *(Gersten v Senkowski,* 426 F3d 588; *People v Ciaccio,* 47 NY2d 431; *People v Taylor,* 75 NY2d 277; *People v Mercado,* 188 AD2d 941; *People v Carroll,* 95 NY2d 375; *People v Miles,* 294 AD2d 930, 98 NY2d 678; *People v Bassett,* 55 AD3d 1434.) II. Appellant's rights to a fair trial under the Fifth and Fourteenth Amendments of the United States Constitution and article I, § 6 of the New York State Constitution were violated by the trial court's order precluding testimony of four character witnesses regarding his reputation in the community for truthfulness and honesty. *(People v Fanning,* 209 AD2d 978, 85 NY2d 908; *People v Bouton,* 50 NY2d 130; *People v Malinowski,* 43 AD2d 189; *People v Kuss,* 32 NY2d 436; *People v West,* 271 AD2d 806; *People v Howie,* 210 AD2d 255; *People v D'Alessandro,* 184 AD2d 114; *People v Burkhardt,* 143 AD2d 104; *People v Richardson,* 114 AD2d 980; *People v Pryor,* 70 AD2d 805.) III. The People's introduction of prejudicial nurse-practitioner testimony improperly bolstered the credibility of the complainant. *(People v Major,* 154 AD2d 225.) IV. The time frames charged in the indictment and bill of particulars are impermissibly broad; consequently, the indictment lacked the specificity required by CPL 200.50, the Constitution of the State of New York, and the United States Constitution. *(People v Morris,* 61 NY2d 290; *People v Iannone,* 45 NY2d 589; *United States v Cruikshank,* 92 US 542; *People v Sedlock,* 8 NY3d 535; *People v Watt,* 81 NY2d 772; *People v Feliciano,* 196 AD2d 774, 82 NY2d 894; *People v Johnson,* 233 AD2d 887, 89 NY2d 1095; *People v Beauchamp,* 74 NY2d 639.) V. The trial court erred in its preliminary instructions when it advised the jurors not to come to any conclusions involving innocence prior to deliberations. *(United States v Peters,* 3 US 121; *People v Giddens,* 202 AD2d 976, 83 NY2d 871; *People v Ahmed,* 66 NY2d 307; *People v Mehmedi,* 69 NY2d 759.) VI. Appellant was denied effective assistance of counsel. *(People v Baldi,* 54 NY2d 137; *Strickland v Washington,* 466 US

668; *Gersten v Senkowski,* 426 F3d 588.) VII. The evidence supporting appellant's conviction is legally insufficient. (*People v Contes,* 60 NY2d 620; *Jackson v Virginia,* 443 US 307; *In re Winship,* 397 US 358.)

Frank A. Sedita, III, District Attorney, Buffalo (*Shawn P. Hennessy* and *Donna A. Milling* of counsel), for respondent. I. Defendant's argument that child sexual abuse accommodation syndrome testimony was used to bolster the credibility of the child victim is unpreserved and meritless. (*People v Martin,* 50 NY2d 1029; *People v Rodriguez,* 56 NY2d 557; *People v West,* 56 NY2d 662; *People v Vidal,* 26 NY2d 249; *People v Cronin,* 60 NY2d 430; *People v Williams,* 6 NY2d 18; *People v Carroll,* 95 NY2d 375; *People v Taylor,* 75 NY2d 277; *People v Keindl,* 68 NY2d 410, 69 NY2d 823; *People v Ciaccio,* 47 NY2d 431.) II. The trial court properly denied the introduction of four character witnesses who would have testified to defendant's reputation for truth and honesty in the community because the subject matter of their testimony did not relate to the charges of sodomy or sexual abuse. (*People v Van Gaasbeck,* 189 NY 408; *People v Miller,* 35 NY2d 65; *People v Sulkey,* 195 AD2d 1026; *People v Fanning,* 209 AD2d 978; *People v Renner,* 269 AD2d 843; *People v Minucci,* 68 AD3d 1017; *People v Chisolm,* 7 AD3d 728; *People v Lopez,* 258 AD2d 388; *People v Scarola,* 71 NY2d 769.) III. The claim that the admission of the victim's statements to medical personnel deprived defendant of his right to a fair trial is meritless. (*People v Harris,* 151 AD2d 981, 74 NY2d 810; *People v Dennee,* 291 AD2d 888, 98 NY2d 650.) IV. The indictment gave defendant fair notice of the charges. (*People v Morris,* 61 NY2d 290; *People v Watt,* 81 NY2d 772, 84 NY2d 948; *People v Beauchamp,* 74 NY2d 639; *People v Keindl,* 68 NY2d 410; *People v Sedlock,* 8 NY3d 535; *People v Eisemann,* 248 AD2d 484.) V. Defendant's argument that the trial court's preliminary instruction was improper is unpreserved. (*People v Robinson,* 36 NY2d 224; *People v Reynolds,* 25 NY2d 489; *People v Schwartzman,* 24 NY2d 241; *People v Simons,* 22 NY2d 533; *People v Belge,* 41 NY2d 60.) VI. Defendant was afforded effective representation by his trial counsel. (*People v Rivera,* 71 NY2d 705; *Strickland v Washington,* 466 US 668; *People v Benevento,* 91 NY2d 708; *People v Baldi,* 54 NY2d 137; *People v Satterfield,* 66 NY2d 796; *People v Flores,* 84 NY2d 184; *People v Ford,* 86 NY2d 397; *People v Aiken,* 45 NY2d 394; *People v Modica,* 64 NY2d 828; *People v Brown,* 7 NY2d 359.) VII. Defendant's claim that the conviction was procured with insufficient evidence is unpreserved. (*People v Belge,* 41 NY2d 60;

*People v Hawkins*, 11 NY3d 484; *People v Gray*, 86 NY2d 10; *People v Hines*, 97 NY2d 56; *People v Finger*, 95 NY2d 894; *People v Bynum*, 70 NY2d 858; *People v Stahl*, 53 NY2d 1048; *People v Cona*, 49 NY2d 26.)

## OPINION OF THE COURT

READ, J.

On November 16, 2006, defendant Michael Spicola was charged in a 10-count indictment with six counts of first-degree sodomy (Penal Law § 130.50 [3]), three counts of first-degree sexual abuse (Penal Law § 130.65), and one count of endangering the welfare of a child (Penal Law § 260.10) stemming from three occasions when he was accused of engaging in reciprocal oral to genital contact with a young boy. These sexual encounters were alleged to have occurred between March 1, 1999 and April 30, 1999, a 61-day period when the boy was a six-year-old first grader; June 15, 2000 and August 31, 2000, a 77-day period during which the boy turned from seven to eight years old; and September 1, 2000 to November 30, 2000, a 91-day period when the boy was an eight-year-old third grader.

At defendant's subsequent jury trial, the boy's mother, a single parent, explained that defendant, her cousin, had been "involved in [her] life" after she moved back to western New York, where she grew up; he helped her out with chores, and occasionally watched her young son. The boy was friendly with defendant's daughter and youngest stepson, who were just a few years older than he was; he visited defendant's residence and slept over in 1999 and 2000 a "[f]ew times a year," including during spring break in 1999. Defendant took the boy to sporting events, and was his soccer coach during 2004.

The mother first sensed that "something wasn't right" in early 2006, when defendant, who had a college degree in advanced accounting and was self-employed as a tax preparer, stopped by her house to drop off her tax return. Defendant approached her son and started to tickle him, which the mother did not consider to be anything other than ordinary horseplay; however, she thought her son's reactions were "weird." First, he "went . . . chest down on the ground . . . and tightened up and then . . . walked away" from defendant and retreated to the couch next to the chair in which she was seated. When defendant sat down beside the boy and rubbed his back, he responded by curling up into "the fetal position . . . and leaned away from" defendant.

At some point the week after this episode, the mother cautioned her son that if "anybody ever touche[d] [him] wrong [he] need[ed] to tell," and reassured him that she would not care who it was, even if one of several male relatives whom she named, including defendant. The boy indicated that he had never experienced such a thing, saying "[N]o mom, it's fine." He testified that he answered in this way because he "didn't know if [he] could go to the police or not" and "thought [he] would get in trouble," and defendant "was close to the family and [he] just thought something really bad would happen" if he revealed that defendant had touched him inappropriately. But after the boy saw a video about on-line sexual predators, shown in his eighth-grade technology class in early April 2006, he realized that what defendant had done to him "was wrong," and "felt like [he] should tell someone." He resolved to confide in his mother, but still hesitated. Then, as he was showering before going to school on May 15, 2006, the day after Mother's Day, he felt as though he "couldn't hold it in anymore," and he "just ran and told" his mother that "Mike had touched [him] many different ways."

The boy made this disclosure at the age of 13, seven years after the first and almost six years after the last instance of alleged molestation. Upon hearing her son's account, the mother immediately called her own mother, who was at work at the time, and the boy's father, asking them to come to her house urgently. She testified that her son sat on the living room couch and cried for a long time after he divulged his secret, and that he was "withdrawn, sad, scared" as the day wore on, and for many months thereafter. The boy's grandmother and father recalled finding him crying when they arrived; they described the mother as angry and distraught. The mother contacted the police, and a detective from the Erie County Sheriff's Department called her back later that day. The following day, she took the boy to the Child Advocacy Center (CAC) in Buffalo, where he was interviewed by a prosecutor and examined by a nurse-practitioner, who recommended counseling.

On the witness stand, the boy recounted the sexual abuse as having taken place while defendant played "knee hockey" alone with him, in the nude, in the living room of defendant's home, generally in the afternoon. In this game, the players got down on their knees and tried to shoot a ball into designated goals, using miniature hockey sticks. On cross-examination, defense counsel pressed two considerations in particular: that the boy

had taken a long time to report these events; and that he had continued to associate with defendant in the meantime. Thus, defense counsel asked questions causing the boy to acknowledge that for six or seven years he neglected to alert his mother, his grandmother, his friends, his teachers or any doctor who examined him; and that he visited defendant's house after the last alleged sexual encounter, saw defendant several times a week during soccer season in 2004, when defendant coached his team, and accompanied him on outings to stock car races and professional hockey games when he was 12 or 13 years old. Defense counsel also elicited an admission that the boy had not mentioned one vivid detail of his story to the grand jury.

Defendant testified on his own behalf. He stated that the boy first slept over at his residence during Christmas vacation in 1999, not the spring of 1999, and that he next slept over, accompanied by a friend, during Christmas vacation in 2000 and the Martin Luther King holiday weekend in 2001. Defendant asserted that he was never at any time alone in his house with the boy because there were always other family members around while the boy was there. Further, the boy "beg[ged]" to stay overnight after a family reunion in the summer of 2001 because "a week or two before [he] bought [his] kids a trampoline and [the boy] was having a lot of fun playing on the trampoline." According to defendant, the next time the boy slept over was after accompanying him and his youngest stepson to a stock car race over Memorial Day weekend of 2004; and he stayed over again, with another boy, after again going to a stock car race with defendant, this time in late September 2004. Defendant testified that he took the boy to professional hockey games in November 2005 and March 2006.

In defendant's telling, "knee hockey" was a game "invented" by his three stepsons, which the children played in the living room of his house. He sometimes joined in, "[j]ust to have fun with [his] kids," and the boy played with them when he visited. Defendant flatly denied ever having played "knee hockey" alone with the boy; he flatly denied the charges in the indictment.

On cross-examination, the prosecutor brought out that defendant had omitted his several-year stint as a full-time school bus driver from the lengthy work history he gave during direct examination. Defendant admitted that he was given a directive by the school superintendent in January 2002, and resigned from his post in May 2003 by mutual agreement with the union and the school district, although he denied ignoring the

directive.[1] He called the boy "a normal kid" with whom he had enjoyed good relations; he likewise indicated that he had always gotten along well with the boy's mother. Although defendant suggested that he might have "some ideas" about why the boy would lie, he never shared these ideas with the jury. He admitted tickling and wrestling with the boy on occasion. Defendant denied having told the detective with whom he spoke by telephone on May 20, 2006 that he may have accidentally touched the boy in an intimate area, but noted that "whenever someone is wrestling you can accidentally touch someone's private parts."

The jury convicted defendant on all counts. On August 9, 2007, the trial judge sentenced him to concurrent determinate terms of 12 years for first-degree sodomy; seven years for first-degree sexual abuse; and one year for endangering the welfare of a child. Defendant appealed on numerous grounds, including that the trial judge erred when he permitted testimony from a nurse-practitioner who examined the boy and expert testimony from a clinical social worker relating to child sexual abuse accommodation syndrome (CSAAS). On April 24, 2009, the Appellate Division affirmed (61 AD3d 1434 [4th Dept 2009]). A Judge of this Court granted defendant permission to appeal (14 NY3d 805 [2010]), and we now affirm.

I.

The Nurse-Practitioner

A. The Objection

Defense counsel sought to preclude the testimony of the pediatric nurse-practitioner who examined the boy the day after he confided in his mother. He advanced several arguments: first, that the nurse "would not be in any position to give an opinion that the young man was molested or abused"; second, she found no physical evidence of sexual abuse; and third,

> "she would be asked about a history that she received from [the boy], and by allowing that testimony that would be improper bolstering. It's not outcry because it's 6 or 7 years later. Even though they are statements made to a nurse they wouldn't have any relevance to any diagnosis because she doesn't make any diagnosis.

---

1. Defense counsel obtained a *Sandoval* ruling proscribing inquiry into the "parent concern" prompting the directive.

"So . . . to allow her to testify and to tell the jury about the history she received and any of her alleged findings would be unfairly prejudicial."

When the trial judge asked the prosecutor why the nurse was being called, she gave several reasons. First, she pointed out that a nurse-practitioner is, unlike a registered nurse, competent and authorized to make a medical diagnosis; she cited CPLR 4518 (business records); she asserted that jurors may question the lack of physical evidence in a sexual abuse case, and the nurse could explain that this circumstance was not inconsistent with the boy's account, which was especially important "when there [are] references by the defense . . . there is no medical evidence."

The prosecutor also told the judge that she expected the nurse "to describe her actual observations both in terms of physical findings, . . . the lack of objective evidence [of sexual abuse], but also her observations of the child's demeanor . . . [which] would relate to his credibility to rebut a potential defense of fabrication here." Finally, she argued that the delay in reporting did "not in any way make [the nurse's] subjective history or the patient's objective history irrelevant," as the nurse would still have to ask the same questions and perform the same examination "whether it's 1 month or 6 years" after the alleged sexual abuse occurred.

The judge agreed that "the issue" was whether the boy's statements were germane to his treatment, and asked what the boy told the nurse. The prosecutor responded that he had "describe[d] basically the oral contact." The judge then said, "I presume it's not a detailed account?" The prosecutor answered affirmatively, and told the judge that she had warned the nurse to stay away from identifying the perpetrator, or where or how many times the alleged sexual abuse occurred. The judge asked if she planned to offer the medical record into evidence. The prosecutor responded that she would rely solely on the nurse's testimony "because there [were] so many things . . . that would be improper [she] would have to redact the whole record." The judge ruled that the nurse could testify.

B. The Testimony

The nurse, who had extensive and specialized training and experience examining child victims of sexual and physical abuse, was asked to perform a medical examination of the boy on May 16, 2006 at the CAC, where she was employed. The boy was at

the CAC that day for an "MD, multiple disciplinary interview." She testified that she would first take a child's medical history and then perform a "top to bottom physical exam." In terms of taking a medical history, she would ask a child why he or she was at the CAC, and would inquire about the child's health because she "need[ed] to understand if there [were] any concerns or problems going on . . . [and] what [the child's] developmental ability [was]." She stated that it would be necessary for her to take a subjective history from a patient even where suspected sexual abuse occurred a number of years earlier because she "need[ed] to know [of] any problems, any lesions, any sores, any concerns." When asked if that was why she took a subjective history of the boy, she answered, "Yes, it is."

The prosecutor reminded the witness that she could not "discuss . . . details other than what was specifically told to [her] that was relevant to [her] diagnosis and treatment"; and then asked what the boy said about what had happened to him. She answered that the boy indicated that "he had been touched inappropriately," and "gestured to his groin that it had been put in his [sic] mouth and he was asked to put somebody else's into his mouth." She testified that the boy was "embarrassed, [with] downcast eyes, flushed face" when he gave her this information.

The prosecutor next posed questions to the nurse about the physical examination that she performed on the boy. The nurse described the first part as a general examination akin to a regular physical; she testified that the boy's heart rate was elevated, which indicated to her that he was "nervous." The last part of the examination focused on the genital and rectal area. Because of what he told her about "what had happened to him," she "was looking to make sure that the exam would have been normal, that there were no lesions or sores, discharges." The prosecutor next asked the nurse if the absence of lesions was in any way "inconsistent with what [the boy] had told [her] about what had happened." She replied that it was not "[b]ecause we generally would not see or many times . . . do not see medical evidence from children who have been touched inappropriately."

The nurse added that she "spent quite awhile talking with" the boy, who was concerned that "people would know that this happened to him." Additionally, "he had some body changes as he was growing up and he was very uncomfortable with that, so [she] spent a long time talking about body change, hormones, normal growth, normal things that happen to your body." The

nurse was asked how she could spot the boy's discomfort, and she replied, "He had downcast eyes. He was flushed, heart rate was up." She "reassured [the boy] that he hadn't done anything wrong and that his body was normal."

On cross-examination, the nurse acknowledged that she had no way of knowing whether the history of sexual abuse that the boy related to her was true or false; and that it would not be unusual for a 13-year-old boy to exhibit signs of nervousness when talking to a stranger about "private matters." Further, defense counsel brought out that she knew what physical signs or symptoms to look for that "could be consistent with abuse," and that she "found no physical evidence to support the history that [the boy] even had been touched inappropriately."

This cross-examination caused the prosecutor to return on redirect examination to ground that she had already covered: whether it was "at all unusual" that the nurse did not detect "any lesions or actual physical injury." The nurse replied that it was not unusual. On re-cross-examination, defense counsel countered, asking "And the fact that you found nothing is just as consistent with this child never having been abused or never having been molested, right?" The nurse responded "That is correct, sir."

C. Discussion

Defendant contends that the nurse-practitioner's testimony improperly bolstered the boy's credibility "with regard to exactly what he claimed had occurred" by "describ[ing] the exact acts" that he related to her. To the extent that the boy's responses to the nurse's inquiries about why he was at the CAC were germane to diagnosis and treatment—and she testified that they were—these responses were properly admitted as an exception to the hearsay rule (see People v Ortega, 15 NY3d 610 [2010]). Indeed, without the boy's explanation of what he claimed to have happened and when, the nurse would hardly have known where to begin her examination. Moreover, the nurse did not identify who the boy said touched him (cf. People v Caccese, 211 AD2d 976, 977 [3d Dept 1995] [allowing nurse to testify that child informed her that foster mother had caused bruises on his hand]); she acknowledged that she did not know whether the boy was being truthful. The testimony about the nature of the alleged abuse consisted of a single question and a brief answer. And the nurse's observations of the boy's demeanor and manner were relevant to her medical decisions

about the necessity for counseling or psychological therapy or other treatment.[2]

In *People v Buie* (86 NY2d 501 [1995]), we considered whether the admission of a 911 tape under the hearsay exception for present sense impression, where the declarant was available and testified at trial, improperly bolstered his trial testimony. We explained that the term "bolstering" has "doctrinally referred to two distinct situations, both related to the rule against hearsay" (*id.* at 509-510). The first common use of the term arose "in the context of eyewitness identification, [where] the testimony of a third party (typically, a police officer) to the effect that the witness identified a defendant as the perpetrator on some prior occasion [was] generally inadmissible" because the "identification evidence [was] hearsay, not falling within any exception" (*id.* at 510). Second, the term "bolstering" "refers to the fortification of a witness's testimony and credibility through the use of a prior consistent statement . . . Such evidence may be admissible, but only to rebut a claim of recent fabrication . . . A prior consistent statement is admitted under these limited circumstances as an exception to the hearsay rule" (*id.* [citations omitted]).

We concluded that the admission of the 911 tape did not constitute improper bolstering, observing that "merely because a statement suffers some impediment under one hearsay exception does not preclude the proponent of the evidence from satisfying a court that a different, better-fitting exception fully applies. That is when the trial courts . . . exercise their evaluation of probativeness versus undue prejudice" (*id.* at 511). Although the 911 tape "plainly did not qualify for admission under the prior consistent statement exception, as there was no charge of recent fabrication . . . [it] fulfilled all the requirements independently for the present sense impression exception" and was therefore admissible (*id.*). Similarly, the nurse's complained-of

---

**2.** The dissent disagrees, stating that the "[c]omplainant's embarrassment or nervousness . . . had no medical significance whatsoever" (dissenting op at 468). While we believe the boy's demeanor was relevant to diagnosis and treatment, this fact has no bearing on the admissibility of the nurse's testimony in this regard. The boy's flushed skin and elevated heart rate are not "statements" and thus do not constitute inadmissible hearsay. We know of no decisions holding that a witness's testimony describing a hearsay declarant's demeanor or expression is inadmissible. A jury has to decide a declarant's truthfulness, and the manner in which a statement was made can be important to that assessment—and might cut either (or no particular) way (*see* discussion, *infra* at 453).

testimony, as already discussed, falls within the exception to the hearsay rule for statements relevant to diagnosis and treatment. As a result, they do not improperly bolster the boy's testimony.

The nurse's testimony rounded out the narrative of the immediate aftermath of the boy's disclosure to his mother and, more importantly, addressed the negative inference that jurors might draw from the absence of medical evidence of abuse.[3] The jury learned essentially three things: that a very thorough medical examination turned up no evidence of sexual abuse, that the boy told the nurse roughly what he told his mother the day before, and that he struck the nurse as nervous and uncomfortable. The first two pieces of information were not harmful to defendant. And assuming the jury believed that the nurse accurately perceived the boy's state of mind, there were, as defense counsel pointed out, any number of different explanations for his demeanor, none conclusively bearing on credibility. After all, he might have appeared nervous whether telling the truth or lying.

## II.

### The Clinical Social Worker
### A. The Objection

The day jury selection was scheduled to begin, defense counsel argued a motion in limine, seeking to preclude certain evidence, including "the alleged expert testimony of an undisclosed prosecution witness on the topic of" CSAAS.[4] In the motion papers, defense counsel mentioned that the prosecution, at a pretrial conference on March 2, 2006, "stated that it anticipate[d] calling an expert witness on the topic of" CSAAS "to address the delayed reporting of the alleged incident"; and that defense counsel, in turn, "anticipated that this prosecution expert [would] testify about CSAAS, a term initially coined by Dr. Roland Summit" to describe a pattern of "secrecy, helplessness, entrapment [and] accommodation, delayed disclosure, and

---

3. In his closing argument, defense counsel commented that although the nurse testified that she "found nothing, but that is consistent with this type of case[;] [i]t's also consistent with the claim never happened."

4. Defense counsel also sought to preclude the prosecution from introducing in its case-in-chief statements alleged to have been made by defendant to the detective in the May 20, 2006 telephone conversation; and asked for a *Sandoval* ruling precluding the questioning of defendant, if he took the stand, "about a matter concerning a student at the North Collins Central Elementary School" (*see supra* at 448 n 1).

recantation as common characteristics in children who report sexual abuse" (internal quotation marks omitted; *see* Roland C. Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177 [1983]; *see also* Roland C. Summit, *Abuse of the Child Sexual Abuse Accommodation Syndrome*, 1 J Child Sexual Abuse 153 [1992] [emphasizing that CSAAS was not a diagnostic tool—i.e., the fact that a child exhibits one or more aspects of CSAAS does not tend to prove that sexual abuse occurred]).

Defense counsel argued that "[d]elayed disclosure may be indicative of abuse and it might not"; therefore, CSAAS "cannot establish or state that sexual abuse did in fact occur in this case." Further, he complained that

> "[t]o present a prosecution expert to testify that any way a child responds to sexual abuse and later reports the alleged abuse is consistent with the way other children have been observed to have reacted only suggests that any story told by any child should be believed. There is no way for the defense to refute such testimony since it cannot cross-examine that testimony without the expert having the ability to speak to the facts of the case the testimony relates to. Under the guise of objective assistance, the expert is a prosecution advocate by binding him or herself in ignorance of the facts of the case. This sends a message that the jury should consider that no matter the specific facts of this case, the child's report has been made in a manner consistent with how some other sexually abused children reported in the past."

Finally, defense counsel quoted a lengthy excerpt from an article reviewing the disclosure patterns of children with validated histories of sexual abuse. In the excerpt, the authors criticized courts for permitting CSAAS testimony without "carefully scrutiniz[ing]" its scientific basis, and opined that, under the testimonial standard established by *Daubert v Merrell Dow Pharmaceuticals, Inc.* (509 US 579 [1993]),

> "the only component of the CSAAS that has empirical support is that delay of abuse disclosure is very common. However, the probative value of expert testimony on delayed disclosure, whether for evidentiary or rehabilitative reasons, is undetermined;

some evidence suggests that knowledge about delay of disclosure is within the ken of the jury, perhaps therefore obviating the need for expert evidence on the issue of delay . . .

"[T]here is no convincing evidence that CSAAS testimony on denial or recantation provides relevant or reliable assistance to the fact finder to assess allegations" (Kamala London et al., *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?*, 11 Psychol Pub Pol'y & L 194, 220 [2005]).

Defense counsel took the position that, in light of the quoted excerpt, there did not "appear to be either acceptance within the scientific community that CSAAS identifies and describes behavioral characteristics commonly found in victims of child sexual abuse or that such behavioral characteristics require the use of an expert to assist the jury."

In oral argument of the motion in limine, defense counsel emphasized that there was a "fairly lengthy delay of 6 or 7 years" in this case, and he assumed the prosecution's expert would "say that children who are abused invariably delay reporting . . . The expert will say there are reasons for that because of secrecy and other reasons personal to the child." He contended, however, that "[j]uries understand that" and that it was not necessary for "an expert [to] come in and tell a jury that children who are abused don't report it right away and sometimes it takes a long time."

The trial judge then asked "Do you want to stipulate to that." Defense counsel demurred, but he still maintained there was no need for an expert as potential jurors are "besieged with this [information] from the Oprah Show to Montel Williams to Jerry Springer" such that "the proverbial bottom line" was that they "understand [delayed reporting] and we don't need an expert to come in and tell us." He also objected because he assumed "the expert's testimony . . . will be that this is the pattern with people who are abused. And when you are abused you wait" so that "even though the expert will say, oh, I never interviewed the victim or his family, the unavoidable inference almost always is that this kid must have been abused because he fits into this so-called pattern."

The prosecutor rejoined that defense counsel's arguments "pertain[ed] to the weight that the jury [would] afford the expert's testimony"; and that the Fourth Department in *People*

*v Miles* (294 AD2d 930 [2002]) had held that expert testimony about CSAAS was admissible; the prosecutor also cited our decision in *People v Carroll* (95 NY2d 375, 387 [2000]). She concluded by arguing that

"[e]ssentially, as long as there is no attempt to the diagnostic or to offer an opinion that . . . abuse occurred, certainly counsel can conduct an extensive cross examination as to whether or not the presence of certain factors leads him or anyone to the conclusion that abuse did or did not occur. The expert is very cautious and careful in not invading the province of the jury by indicating that this is simply a discussion of a broad range of behaviors. And while it may not appear necessary [to defense counsel] . . . to have such an expert, unfortunately in today's day and age it is necessary for the People to rely on this expert because many of the factors or components of the syndrome are completely counterintuitive . . . We know that based on our prior trial record in Erie County where jurors have acquitted defendants basically indicating well, if such and such abuse occurred that child never would have returned to the scene or location of the abuse . . . [Jurors] expect children . . . to tell right away . . . [J]uries watch a lot of CSI and all the various shows associated with the law and they do often expect children to tell right away."

The judge indicated that it was "pretty well settled" that this type of testimony was admissible, apparently referring to *Carroll* and *Miles*, and that it was "going to come in." Defense counsel noted that it was "discretionary with the Court," causing the judge to reiterate "It's coming in."

B. The Testimony

The expert was a licensed clinical social worker at Child and Adolescent Treatment Services in Buffalo, who had extensive and specialized training and experience in the field of child sexual abuse. He testified that since 1975 he had provided direct treatment to over 3,000 children, and had testified in court 222 times, on behalf of both the defense and the prosecution. The expert was asked by the prosecutor if he was "familiar with any of the specific facts of this case," and if he knew "anything at all about the parties involved." He responded negatively on both counts. The prosecutor then questioned him as follows:

"Q. And is it true that you are not here to offer this jury an opinion as to whether or not the victim in this case was in fact a victim of sexual abuse?

"A. That is correct. I'm not here to offer an opinion.

"Q. What is the purpose of your testimony, sir?

"A. The purpose of my testimony is to provide information to a jury or the trier of fact regarding how children respond to being sexually abused and what is commonly seen. The other side is what are the common misconceptions that people have regarding children and child sexual abuse.

"Q. Is it fair to say then that you are here to talk about the range of behaviors that are associated with child victims of child sexual abuse?

"A. Yes, I am here to speak about the range that you observe."

The prosecutor asked the expert if he was familiar "with the scientific research" in the field; specifically, CSAAS. The expert answered that he was. He identified CSAAS as originating with Dr. Summit's work in 1983, and listed its five categories—secrecy; helplessness; entrapment and accommodation; delayed, conflicted or unconvincing disclosure; and retraction or recantation. The prosecutor asked if the syndrome was "a diagnosis in any way," and the expert responded "No, it was never intended to be."

The expert testified that CSAAS was generally accepted as valid within the relevant scientific community of his specialty, and that many follow-on studies, "some focusing on how children disclose," had been undertaken since 1983.[5] The prosecutor asked the expert if "the concepts of the syndrome show contradictions to widely held beliefs and views about behaviors of child sexual abuse victims." He replied "Yes" and that "[f]or one . . . adults think that kids are going to immediately say when something happened to them." He was asked if the presence of any one of the five kinds of behavior "mean[s] in and of

---

5. The expert mentioned the 2005 study by London and colleagues, referenced by defense counsel in his motion in limine, and a subsequent revision of it (*see* London et al., *Disclosure of Child Sexual Abuse: A Review of the Contemporary Empirical Literature*, in Child Sexual Abuse: Disclosure, Delay and Denial, at 11 [Margaret-Ellen Pipe et al. eds 2007] [hereafter, London 2007]).

itself that the child was abused," to which he again warned that CSAAS "was never intended to be used in that manner." He was then asked if the "absence of any one of those categories or behaviors necessarily mean[s] that [a] child was not abused," to which he similarly responded "Again, it was not intended. It's intended [to] get you to think, to include ideas."

The prosecutor next called on the expert to explain each of the five categories in more detail, and posed various questions in this context; specifically, whether the degree of helplessness might vary, depending on the child's age; whether a child is more likely to be abused by a stranger or someone whom the child knows; how a child abused by a trusted adult reacts; whether victims are predominantly male or female; how a child might react if the abuser was someone close to his or her mother; whether the abuse typically occurs outside the direct view of others; whether there are circumstances where the abuse occurs in the presence of others and in what type of case this might happen; whether the concept of secrecy requires a verbal threat; what types of activities, including sexual activity, an abused child might employ as a coping mechanism; whether a child's psychological immaturity might affect willingness to return to the scene of the abuse; whether a child who had been sexually abused might still want to associate with the abuser; whether there was any research linking a higher incidence of delayed disclosure to one sex or the other, and, if so, the factors associated with such a phenomenon and the relative length of delay; whether a delayed disclosure on the order of six or seven years would be unusual; whether the range of delay might include waiting even longer; if the age of the child at the time of the abuse might affect whether there was a delay in reporting; whether a triggering event might prompt disclosure; whether "an educational component about the awareness of sexual abuse" might constitute a triggering event; the emotional consequences for a child after disclosure and whether such consequences might last a long time; how a delay in disclosure might affect a child's memory of the actual abuse; and whether abused children always recant. To "recap," the prosecutor asked "if the child's behavior shows aspects of the first four categories that you discussed, but there is no recantation involved, does that automatically mean or does it still fit within the parameters of the syndrome?" The expert replied that "[s]ince the parameters were meant to get me to think about the child, it's presence or absence is just something I note. It doesn't have diagnostic value."

Defense counsel did not object to any of the questions posed to the expert. On cross-examination, he brought out that the expert had testified only 20 times for the defense, and was not a physician, psychologist or Ph.D.; that CSAAS referred to a broad range of behaviors; that every case was different; that the expert knew nothing about the facts of this case, and, in particular, had never met, interviewed or had any discussions with the boy, his mother or anyone else in his family; and that he did not know whether the boy's allegations were true.

When defense counsel questioned whether the allegations might have been something the boy "made up" and "may never have happened," the expert replied "I don't know." The following questions and answers ensued:

> "Q. And in many of the cases that you have seen children do make up these allegations from time to time, do they not?
>
> "A. Well, you use the word many, and the answer to that is, no. Because in the 154 cases that I did for the Department of Social Services, we had 4 cases where the allegations were unfounded.[6]
>
> "Q. But whether or not the allegations are unfounded in this case, you don't know?
>
> "A. That is correct, I don't.
>
> "Q. Whether there was any motive for this young man to make up a story, you don't know?
>
> "A. I don't know anything about the case.
>
> "Q. Whether he has some problem with his mother that would have caused this to happen you don't know, true?"

At this juncture, the prosecutor objected; the judge ruled that defense counsel could "make his point."

---

**6.** When describing his education, training and experience, the expert mentioned that he had treated 154 "perpetrators of sexual offenses." Defense counsel having provoked a damaging answer on cross-examination about the incidence of false claims, the prosecutor followed up on redirect examination. She elicited testimony from the expert that three of these false claims occurred in the context of divorces where the children had been coached, and the remaining case involved an adolescent female who was trying to get her father to pay attention to her in this "very misguided" way. Defense counsel did not object.

Defense counsel next reviewed with the expert his testimony that young children might return to the scene of their sexual abuse for various reasons, and asked if a child might return because no abuse had, in fact, taken place. The expert answered that "[a] youngster could go back for that reason," and that he didn't know "this child's state of mind." Defense counsel then added "Because all you have talked about here today are generalizations from these studies, right?" The expert agreed. Defense counsel concluded "And you don't know anything specific about this case, what any motivations were or whether this young man was truthful or not, correct?" and the expert agreed "That's correct. That's the job of the jury."

C. Discussion

Defendant maintains that the trial judge improperly admitted the expert's testimony regarding CSAAS because it bolstered the boy's credibility to prove that the abuse, in fact, occurred. This is not the first time we have dealt with this type of bolstering argument, or a close variation of it. In *People v Keindl* (68 NY2d 410 [1986]), the defendant was convicted of 26 counts of sodomy, sexual abuse and endangering the welfare of his stepchildren. He contended that the trial court erred in admitting the testimony of a psychiatrist, "presented to explain how children who have been repeatedly sexually abused by their stepfather[ ] [were] likely to suffer psychologically," because such testimony would go to the "ultimate question" of the defendant's guilt of endangering the welfare of a child, which was "within the province of the jury to decide and [was] not a subject matter beyond the ken of the ordinary juror" (*id.* at 422).

We disagreed, concluding that

> "[f]or the Trial Judge to have ruled that the range of psychological reactions of child victims who suffer from sexual abuse at the hands of their stepparents is not a subject within the ken of the typical juror, and therefore may be addressed by expert testimony, cannot be said to be an abuse of discretion as a matter of law" (*id.*).

In *Keindl*, the defendant (as was the case here) had attempted to discredit the children by evidence that they had not promptly complained of the crimes (*see People v Taylor*, 75 NY2d 277, 288 [1990]).

In *Matter of Nicole V.* (71 NY2d 112 [1987]), the child made statements to her therapist describing sexual abuse by her

father. In addition to relating the child's hearsay statements describing incidents of sexual abuse, the therapist also testified that the child's behavior was symptomatic of a sexually abused child. The father contended that this opinion testimony was not corroborative within the meaning of Family Court Act § 1046 (a) (vi), which provides that a child's out-of-court statements may be corroborated by any other evidence tending to support their reliability. Citing *Keindl*, we observed that "[t]he psychological and behavioral characteristics and reactions typically shared by victims of abuse in a familial setting are not generally known by the average person and the courts have become increasingly more receptive to admitting expert testimony on the subject" (*id.* at 120). Additionally, we remarked that "such evidence has been accepted by us," referring to *Keindl*, "and by courts of other jurisdictions, *even in criminal cases, either to bolster credibility of infant victims or to corroborate the victim's testimony*" (*id.* at 121 [citations omitted; emphasis added]).

In *Taylor* and *People v Banks* (75 NY2d 277 [1990]), two cases decided together, we explored the proper and improper uses of expert testimony regarding rape trauma syndrome, affirming the conviction and sentence in *Taylor* and reversing in *Banks*. This case is relevant because we analogized this type of expert behavioral testimony to CSAAS, citing *Nicole V.* and *Keindl*. In *Taylor*, the complainant first told the police that she did not know who her attacker was, but then revealed to her mother that her attacker was the defendant, whom she had known for years. The expert—who had not examined the witness and was therefore not reflecting on her behavior specifically—testified "on the specifics of rape trauma syndrome[,] explain[ing] why the complainant might have been unwilling during the first few hours after the attack to name the defendant as her attacker where she had known [him] prior to the incident" (*id.* at 283). Second, the expert testified that "it was common for a rape victim to appear quiet and controlled following an attack, [which] responded to evidence that the complainant had appeared calm after the attack and tended to rebut the inference that because she was not excited and upset . . . , it had not been a rape" (*id.*). We ruled that this expert evidence was "relevant to dispel misconceptions that jurors might possess regarding the ordinary responses of rape victims in the first hours after their attack" (*id.* at 293).

In *Banks*, an 11-year-old girl claimed that the defendant had raped and sodomized her. Both the complainant and her

grandmother testified that after this alleged incident, the girl had suffered from nightmares and cold sweats in the middle of the night, had been afraid to return to school, had become fearful and had been running and staying away from home. The prosecution's expert then testified "hypothetically that the kind of symptoms demonstrated by the complainant were *consistent with a diagnosis* of rape trauma syndrome" (*id.* at 285 [emphasis added]). We reversed because

> "[u]nlike *Taylor*, the evidence was not offered to explain behavior exhibited by the victim that the jury might not understand; instead, it was offered to show that the behavior that the complainant had exhibited after the incident was consistent with a set of symptoms commonly associated with women who had been forcibly attacked. The clear implication of such testimony would be that because the complainant exhibited these symptoms, it was more likely than not that she had been forcibly raped" (*id.* at 284).

We commented that although we had "accepted that rape produces identifiable symptoms in rape victims, we [did] not believe that evidence of the presence, or indeed of the absence, of those symptoms necessarily indicate[d] that the incident did or did not occur" (*id.* at 293); and emphasized that this type of evidence may not be introduced to show that a crime took place.

The defendant in *Carroll* was convicted of first-degree rape and first-degree sexual abuse. His appeal challenged the legal sufficiency of the proof supporting the rape convictions as well as evidentiary rulings, including the trial court's preclusion of a police-recorded audiotape of the defendant's conversation with the complainant, his stepdaughter. We agreed that the evidence was legally insufficient to sustain the rape convictions and that the complained-of evidentiary ruling was an abuse of discretion "result[ing] in a trial that was decidedly skewed in the People's favor" (*Carroll*, 95 NY2d at 387 [citation and internal quotation marks omitted]). Accordingly, we reversed the Appellate Division's order sustaining the defendant's convictions, dismissed the counts of the indictment charging rape, and ordered a new trial on the counts charging sexual abuse.

In light of the retrial, we addressed the defendant's objections to expert testimony explaining CSAAS. Citing *Keindl* and *Taylor*, we noted that

*"[w]e have long held that expert testimony regarding rape trauma syndrome, abused child syndrome or similar conditions may be admitted to explain behavior of a victim that might appear unusual or that jurors may not be expected to understand.* In [*Keindl*], expert testimony was permitted to rebut defendant's attempt to impair the credibility of [sexually abused children] by evidence that they had not promptly complained of the abuse. Here, the People properly offered [the expert's] testimony for the purpose of *instructing the jury about possible reasons why a child might not immediately report incidents of sexual abuse"* (*id.* [citations and internal quotation marks omitted; emphases added]).

We pointed out that the expert "did not attempt to impermissibly prove that the charged crimes occurred," and that he "referred to [CSAAS] only generally insofar as it provides an understanding of why children may delay in reporting sexual abuse," and

"never opined that [the] defendant committed the crimes, that [the] defendant's stepdaughter was sexually abused, or even that her specific actions and behavior were consistent with such abuse. In fact, [the expert] had not interviewed either [the] defendant or his stepdaughter and was not aware of the facts of this case" (*id.* [citations omitted]).[7]

Here, there was no way for defendant to achieve an acquittal if the jury believed the boy because there was no way that the boy might have been honestly mistaken about defendant's conduct; put another way, for defendant to succeed at trial, the jurors had to conclude that the boy was likely deliberately lying. And so from the beginning, defendant attacked the boy's credibility, principally on the basis that he neglected to report the

---

**7.** The only other cases cited by the dissenting opinion are *People v Ciaccio* (47 NY2d 431 [1979]) and *People v Mercado* (188 AD2d 941 [3d Dept 1992]). The facts in *Ciaccio* are quite different from the facts here or in any of the other cases discussed: a detective gave " 'opinion' evidence . . . that many hijackings occur as the victim had related" (47 NY2d at 439). *Mercado* was a case much like *Banks*. The defendant was accused of abusing his two stepchildren, and a social worker who had examined the two children testified that their behavior was "consistent" with the way abuse victims comport themselves. The court concluded that this testimony was impermissible, requiring reversal, but that "[t]o the extent that the expert testimony was directed to the issue of timely reporting, it was properly admitted" (188 AD2d at 943 n).

alleged abuse promptly and continued to associate with defendant after the abuse was claimed to have taken place. Defense counsel in his opening statement emphasized the boy's lengthy silence, the six or seven years when he said nothing "to his mother, to his father, to his grandmother . . . to a teacher at school, to a counselor at school . . . to any friend." He followed up by describing the several occasions after the fall of 2000 and before May of 2006 when the boy visited defendant's house or went on outings with him. Defense counsel's cross-examination of the boy similarly zeroed in on the delay in reporting and the boy's continued association with defendant after the alleged molestations.[8]

---

**8.** To complete the circle, defense counsel in his closing argument detailed several so-called "unanswered questions," including "[W]hy would that young man go back and return to [defendant's house] time after time if what he says happened happened?" and "[W]hy was there such a long delay, . . . some 6 or 7 years before the young man said anything?" He asked for, and received, the following instruction from the trial judge related to the boy's delay in reporting:

> "There is another consideration that I want to mention to you. *That's a word about [the boy's] failure to promptly complain. Obviously, that's been raised throughout this proceeding.* The defendant contends that the failure of [the boy] to complain to family members, school personnel or law enforcement until approximately 6 or 7 years following the events of March '99 through November of 2000 should be considered by you in assessing the credibility of [the boy]. With reference to the time when [the boy] first complained to his mother . . . it is for you, the jury, to determine whether or not such complaint was made within a reasonable time or was in fact unreasonably delayed. Either circumstance may be considered by you as a jury as bearing upon the credibility of the complainant. Your evaluation of [the] time in which the complaint was made must be considered in light of all of the surrounding circumstances, particularly including, but not limited to, the opportunity of the complainant to make the complaint. Among other factors that you may wish to consider would be the complainant's age, past experiences, mental state, fear for his own safety or the safety of others in the household or the lack of such fear. You may also wish to consider the circumstances that motivated the complainant and any and all other circumstances which you may find operated to trigger a delayed disclosure. Whatever weight is to be given to the circumstances is entirely in your hands" (emphasis added; *see* CJI2d[NY] Prompt Outcry).

At defense counsel's request, the trial judge also gave the standard expert witness charge (*see* CJI2d[NY] Expert Witness). He added that "Basically, . . . opinions of expert witnesses are subject to the same rules and tests concerning reliability as the testimony of any other witness."

In this context, the trial judge did not abuse his discretion when he allowed the expert to testify about CSAAS to rehabilitate the boy's credibility. The expert stressed that CSAAS was not a diagnosis; rather, it describes a range of behaviors observed in cases of validated child sexual abuse, some of which seem counterintuitive to a layperson. He confirmed that the presence or absence of any particular behavior was not substantive evidence that sexual abuse had, or had not, occurred. He made it clear that he knew nothing about the facts of the case before taking the witness stand; that he was not venturing an opinion as to whether sexual abuse took place in this case; that it was up to the jury to decide whether the boy was being truthful. In short, defendant staked his defense on the proposition that the boy's behavior, as demonstrated by the evidence, was inconsistent with having been molested; the legitimate purpose of the expert's testimony was to counter this inference. And in the end, the jury obviously believed the boy and disbelieved defendant, who never offered the jurors a motive for the boy to fabricate a report of sexual abuse.

As the discussion of our decisions in *Keindl, Nicole V., Taylor*[9] and *Carroll* shows, we have "long held" evidence of psychological syndromes affecting certain crime victims to be admissible for the purpose of explaining behavior that might be puzzling to a jury (*see Carroll*, 95 NY2d at 387). Indeed, the majority of states "permit expert testimony to explain delayed reporting, recantation, and inconsistency," as well as "to explain why some abused children are angry, why some children want to live with the person who abused them, why a victim might appear 'emotionally flat' following sexual assault, why a child might run away from home, and for other purposes" (*see* 1 Myers on Evidence § 6.24, at 416-422 [collecting cases and noting that Kentucky, Pennsylvania and Tennessee are the only apparent exceptions]).

Defendant complains that the expert's testimony was not adequately constrained because certain of the hypothetical questions too closely mirrored the boy's circumstances and therefore

---

**9.** In *Nicole V.* we called CSAAS "a recognized diagnosis" (71 NY2d at 120); and in *Taylor*, we repeated this passage from *Nicole V.* (75 NY2d at 288). As our opinion in *Taylor* establishes, though, CSAAS is *not* a diagnosis in the sense that the presence of a CSAAS behavior proves child sexual abuse (*see* 1 Myers on Evidence in Child Domestic and Elder Abuse Cases § 6.20, at 408-411 [successor edition to Evidence in Child Abuse and Neglect Cases (3d ed 1997)] [2005] [hereafter, Myers on Evidence] [explaining the difference between diagnostic and nondiagnostic syndromes]).

improperly bolstered or vouched for his credibility so as to prove that the charged crimes occurred. To the extent defendant now complains of specific questions, his argument is not preserved because the questions were not objected to at trial. As a whole, the expert's testimony certainly supported the boy's credibility by supplying explanations other than fabrication for his post-molestation behavior. It was offered, after all, for purposes of just such rehabilitation. But as already discussed, the expert did not express an opinion on the boy's credibility. Early on in his testimony he disavowed any intention of giving an opinion about whether the boy was a victim of sexual abuse. And the jurors could not have become confused on this score since it was made plain to them that the expert could not, in fact, even possess an opinion about the boy's credibility: he had never talked to the boy and was ignorant of the particulars of his allegations; he did not know, for example, that the boy waited six or seven years to claim sexual abuse (the subject of one of the complained-of hypothetical questions) until defense counsel informed him of this on cross-examination. We note that in *Taylor*, the expert, who similarly had not interviewed the complainant before the trial and was not therefore testifying about her behavior as such, offered testimony about conduct that closely resembled the facts of that case (*see supra* at 461).

Defendant also attacks the scientific reliability of CSAAS, citing the Second Circuit's decision in *Gersten v Senkowski* (426 F3d 588 [2d Cir 2005]). Referring to an expert's affidavit in support of the petitioner's federal petition for a writ of habeas corpus, the court declared in *Gersten* that "[i]t would appear" that CSAAS "lacked any scientific validity for the purpose for which the prosecution utilized it: as a generalized explanation of children's reactions to sexual abuse, including delayed disclosure" (*id.* at 611). While we have no way of knowing whether the record in *Gersten* justified the Second Circuit's conclusions about CSAAS, the record here does not support a similar result.

Defense counsel in this case disputed the scientific reliability of CSAAS in the motion in limine, quoting from a review written by London and colleagues, critics of CSAAS; however, the quoted passage does not question the empirical basis for delayed reporting (*see supra* at 454-455; *see also* Thomas D. Lyon, *Scientific Support for Expert Testimony on Child Sexual Abuse Accommodation*, in Critical Issues in Child Sexual Abuse: Historical, Legal, and Psychological Perspectives, at 107, 108 [2002]

["Observational research demonstrates that a substantial proportion of abused children either delay reporting or fail to report their abuse"]; John E. B. Myers, *Expert Testimony in Child Sexual Abuse Litigation: Consensus and Confusion*, 14 UC Davis J Juv L & Pol'y 1, 44 [2010] ["Psychological research demonstrates that delayed reporting is common among sexually abused children"]).[10] Rather, London and colleagues have reservations about the prevalence of denial and recantation, aspects of CSAAS not at issue in this case (*see* London 2007 at 12-13 ["(A)lthough a substantial proportion of children delay reporting or altogether fail to report incidents of child sexual abuse (the secrecy stage), there is little evidence to suggest that denials, recantations, and redisclosures are typical when the abused children are directly asked about abuse during forensic interviews"]).

### III.

Finally, we conclude that the record is insufficient to permit our review of defendant's claim of ineffective assistance of counsel, which he may raise in a CPL 440.10 motion; his remaining claims have been considered and are without merit.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting). This trial concerned events occurring between seven and eight years earlier, as to which no physical evidence could be produced. Defendant did not admit to any unlawful conduct; nor was there any other direct evidence linking him to the crimes. The case, therefore, was essentially a credibility contest between complainant and defendant. The prosecutor thereupon took several steps to improperly and prejudicially bolster the credibility of complainant, as a result of which defendant was deprived of a fair trial. Accordingly, I would reverse and remit to County Court for a new trial.

After complainant reported the alleged sexual abuse to his mother, his physical examination was conducted by a nurse-

---

10. And while London and colleagues assert that CSAAS does not in the main comport with *Daubert* (*see supra* at 454-455), this does not necessarily mean, even if true, that CSAAS is not generally accepted as reliable in the relevant scientific community (*see e.g.* London 2007 at 12 ["The CSAA (child sexual abuse accommodation) model has been endorsed by many clinicians and scholars and has been the basis of clinical and forensic judgments . . . Summit's (1983) paper . . . was rated by professionals as one of the most influential papers in the field of child sexual abuse"]).

practitioner at the Erie County Child Advocacy Center. Defense counsel sought to preclude the nurse-practitioner's testimony for several reasons, including that it would constitute improper bolstering of the complainant's testimony and that it would be prejudicial to defendant. In response to an inquiry by the court, the prosecutor indicated that the testimony was being offered for several reasons. Notably, the prosecutor stated that, among other things, the nurse-practitioner would testify to:

> "her observations of the child's demeanor, his accelerated heart rate, his flushed face, his downcast eyes, everything that would relate to his credibility to rebut a potential defense of fabrication here.

> "So in other words, when the nurse is asking him she's documenting things in the chart that are certainly relevant not only to her diagnosis but in the broader sense to his credibility as a witness because she's showing that he's embarrassed, he['s] flustered, et cetera, and that she's actually looking for lesions."

I agree with the majority that those portions of the nurse-practitioner's testimony that were relevant to diagnosis and treatment were properly admitted. For example, testimony concerning complainant's account of what had happened to him, the extent of the ensuing physical examination, the absence of any lesions or other visible signs of sexual abuse on complainant's body and the significance of such absence were all properly admitted as relevant to diagnosis and treatment (*see People v Ortega*, 15 NY3d 610, 617 [2010]).

The same cannot be said about the nurse-practitioner's testimony concerning complainant's demeanor during the examination. The nurse-practitioner testified that when complainant related what had happened to him, "[h]e was embarrassed, downcast eyes, flushed face." She indicated that she had recorded these details "[b]ecause they were definitely significant when I saw them. He was embarrassed." The nurse-practitioner further testified that complainant's elevated heart rate during the examination indicated to her that "[h]e was nervous."

Complainant's embarrassment or nervousness attending the examination had no medical significance whatsoever. The majority's purported justification for the elicitation of this testimony—that it was relevant to whether some type of counseling or therapy would be required (majority op at 451-

452)—is pure invention. To the contrary, the prosecution was perfectly blunt about why the testimony as to complainant's demeanor was being offered: it was for credibility purposes. The nurse-practitioner's testimony on this point was not relevant to diagnosis and treatment and its admission on that basis was error.

Furthermore, in this situation the error cannot be considered harmless. "[U]nless the proof of the defendant's guilt, without reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of harmless error" (*People v Crimmins*, 36 NY2d 230, 241 [1975]). As noted, the People's case rested almost entirely on the credibility of the alleged victim. It was therefore blatantly improper and prejudicial to use the testimony of a medical professional to bolster complainant's testimony in this manner.

Moreover, the error was egregiously compounded by the scope of the expert testimony on child sexual abuse accommodation syndrome (CSAAS). Prior to trial, defense counsel sought to preclude the CSAAS expert's testimony for two reasons. Counsel argued, first, that the subject matter of the expert's testimony—that children often delay reporting abuse—was not outside the ken of the average juror. In addition, counsel asserted that the expert's testimony would be "overwhelmingly prejudicial and unfair" because the jury would inevitably draw the conclusion that complainant had been abused because he fit within the pattern of behavior recognized by CSAAS. The request was denied and the prosecutor proceeded to ask the expert, in hypothetical terms, about virtually every detail in the case.

Several aspects of complainant's testimony were later raised with the CSAAS expert. Specifically, during his direct testimony, complainant detailed his sexual abuse by a family member—his mother's second cousin. Complainant also related two incidents where he and his young friends had touched each other's penises, which complainant explained was, at least in part, because he was repeating behavior that had been done to him by defendant. Complainant further testified that what ultimately convinced him to tell his mother about the sexual abuse was a video about catching on-line predators that he had watched with his eighth grade computer tech class. Additionally, on cross-examination, complainant testified that his memory had improved as the years passed. Complainant also testified that he was not afraid to return to defendant's house after the alleged abuse, but rather that he wanted to go to the house and had fun when he was there.

The expert testified after the jury had heard complainant's version of events. In response to the prosecution's questions, the expert testified that abuse by a stranger was rare; a child was more likely to be abused by a person he knows and the child's feelings of helplessness would be enhanced if the abuser were a trusted adult who was close to the child's mother. The expert also testified that he had seen children become hypersexualized and use sexuality as a coping mechanism. In response to a question about a child's willingness to return to the scene of the abuse, the expert testified that the child could convince himself that the abuse would not happen again and that the child could be willing to spend time with the abuser because he would want to repeat any positive experiences he had with that person. The expert also testified that boys were "far more likely to delay" reporting sexual abuse and that any period of delay was likely to be far longer than for girls—specifically, that a delay of six or seven years would not be unusual. The expert also responded in the affirmative to the prosecutor's query as to whether "an educational component about the awareness of sexual abuse [could] be a triggering event" for the disclosure of abuse. Finally, the expert testified that a child's memory could actually improve and that more details could come to mind after the child disclosed the abuse.*

"[E]xpert opinion is proper when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror" (*People v Taylor*, 75 NY2d 277, 288 [1990] [citation omitted]). However, where "the sole reason for questioning the 'expert' witness is to bolster the testimony of [the complainant] by explaining that his version of the events is more believable than the defendant's, the 'expert's' testimony is equivalent to an opinion that the defendant is guilty, and the receipt of such testimony may not be condoned" (*People v Ciaccio*, 47 NY2d 431, 439 [1979]). Although we have recognized that CSAAS can be used for the purpose of explaining behavior by a complainant that might appear unusual to the average juror—such as why a child might not immediately report sexual abuse—we have contrasted the permissible use of such testimony with testimony that opines that complainant's "behavior [was] consistent with such abuse" (*People v Carroll*, 95 NY2d 375, 387 [2000]; *see also People v*

---

* On cross and redirect, the expert even managed to inform the jury that in his experience of 154 cases, he had seen only four instances of false allegations, three of them in the context of divorce battles.

*Mercado*, 188 AD2d 941, 942 [3d Dept 1992] [expert's testimony "constitute(d) an impermissible comparison of the complainants' behavior with that commonly associated with victims of these crimes"]).

Even though the expert did not expressly render an opinion as to whether or not complainant was a victim of sexual abuse, the expert's confirmation of nearly every detail of the case and of complainant's behavior as consistent with that of a victim of sexual abuse was the functional equivalent of rendering an opinion as to complainant's truthfulness (*see Ciaccio*, 47 NY2d at 439). The expert's testimony had the effect of improperly bolstering complainant's testimony and, in the context of this case, was extremely prejudicial.

As noted above, this was a case where the credibility of the parties was the key issue facing the jury. Each of the errors, in bolstering complainant's testimony with the nurse-practitioner's perception of his demeanor and the CSAAS expert's validation of his behavior as consistent with that of a victim of sexual abuse, and certainly their cumulative effect, deprived defendant of a fair trial.

Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Chief Judge LIPPMAN dissents and votes to reverse in a separate opinion in which Judges CIPARICK and JONES concur.

Order affirmed.