People v Kachadourian (2020 NY Slip Op 03572)





People v Kachadourian


2020 NY Slip Op 03572


Decided on June 25, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 25, 2020

111698

[*1]The People of the State of New York, Respondent,
v
Garo D. Kachadourian, Appellant.

Calendar Date: May 20, 2020

Before: Garry, P.J., Egan Jr., Mulvey, Devine and Colangelo, JJ.


Robert C. Kilmer, Binghamton, for appellant.
Michael A. Korchak, District Attorney, Binghamton (Lauren D. Konsul, New York Prosecutors Training Institute, Inc., Albany, of counsel), for respondent.



Garry, P.J.
Appeal from a judgment of the County Court of Broome County (Cawley Jr., J.), rendered August 9, 2017, convicting defendant following a nonjury trial of the crime of grand larceny in the third degree.
In February 2015, defendant was indicted on one count of grand larceny in the third degree based on allegations that between May 2013 and March 2014, he stole approximately $13,000 from the victim, an elderly woman who lived alone in a trailer in Broome County. A welfare check in March 2014, when the victim was 74 years old, disclosed that she was disoriented and living in squalor. She was taken to a hospital and thereafter placed in a nursing home with a diagnosis of dementia. An investigation disclosed that defendant, the victim's long-time friend, had taken control of her checking account and, beginning in May 2013, had written a number of checks that were signed by the victim, but were made out to defendant or otherwise appeared to be for his benefit rather than hers.
Defendant waived a jury trial. County Court conducted a bench trial in late 2016. The victim was unable to testify due to her mental condition. The court found defendant guilty as charged. Defendant filed two motions, opposed by the People, to set aside the verdict pursuant to CPL 330.30 (1) and (3). The court denied both motions, sentenced defendant to five years of probation, and ordered him to pay restitution. Defendant appeals.
Initially, we reject defendant's contention that County Court prevented him from presenting a defense by precluding the admission of a certain document. In October 2015, defense counsel wrote a letter to the People claiming that the charge against defendant should be dismissed because defendant was the rightful owner of sufficient funds in the victim's checking account to cover the checks that he had written. Specifically, counsel asserted that, before 2009, defendant had deposited a substantial sum of his own funds into the victim's account to avoid an alleged child support obligation. Attached to the letter was a handwritten statement, dated in May 2009 and bearing the purported signature of the victim. The statement asserted that the victim was of sound mind and acting of her own free will, and that she was holding a stated amount of funds that belonged to defendant.
The People filed a motion in limine to preclude the admission of this statement at trial. Defendant opposed the motion and submitted the report of his expert document examiner, opining that the signature on the statement matched samples of the victim's signature. County Court found that the document was inadmissible hearsay and precluded its admission and, by extension, that of the testimony of defendant's expert.[FN1] We find no error in this conclusion. The 2009 statement had no relevance to the victim's cognitive abilities four years later, when defendant wrote the checks at issue here. Contrary to defendant's claim, the statement was not admissible for the purpose of proving the victim's state of mind, as it was not a statement of the victim's intent to perform a future act and, indeed, no such act was at issue (see People v Reynoso, 73 NY2d 816, 819 [1988]; People v Ramsaran, 154 AD3d 1051, 1053 [2017], lv denied 30 NY3d 1063 [2017]; see generally People v D'Arton, 289 AD2d 711, 712-713 [2001], lv denied 97 NY2d 728 [2002]). The statement was relevant only if offered for its truth — that is, that the victim possessed money that belonged to defendant — and, thus, it was hearsay (see People v Reynoso, 73 NY2d at 819; People v Pascuzzi, 173 AD3d 1367, 1377 [2019], lv denied 34 NY3d 953 [2019]; Guide to NY Evid rule 8.00 [1], Definition of Hearsay). Finally, the statement was not so fundamental to defendant's opportunity to offer a defense that it should have been admitted despite its hearsay nature; notably, the court's ruling did not preclude defendant from offering other proof, such as bank records, that he had deposited funds into the victim's account (compare People v Carroll, 95 NY2d 375, 385-387 [2000] [recorded conversation rebutting People's claim that the defendant never denied allegations against him]; People v Sheppard, 119 AD3d 986, 989-990 [2014] [admission of culpability by a third party]; People v Thompson, 111 AD3d 56, 64 [2013] [victim's diary identifying someone other than the defendant as her attacker]).
Defendant next contends that his conviction is based on legally insufficient evidence and is against the weight of the evidence. In this regard, defendant asserts that he acted "under a claim of right made in good faith" (Penal Law § 155.15 [1]; see Penal Law § 155.05 [1]), in that he used the funds for the victim's benefit and with her knowledge and consent. The defense of "[a] good faith claim of right negates larcenous intent, and the People have the burden of disproving such defense beyond a reasonable doubt" (People v Michaels, 132 AD3d 1073, 1075 [2015]). Defendant asserts that the People failed to establish beyond a reasonable doubt that the victim suffered from dementia to such an extent that she lacked the legal capacity to consent to defendant's use of her funds.
The testimony established that defendant and the victim had been friends for many years. Defendant operated a transportation service in the City of Binghamton, Broome County, where he also repaired and resold vehicles. He and the victim shared a joint checking account until October 2012, when the victim closed that account.[FN2] The People submitted bank records, canceled checks and testimony establishing that, between May 2013 and March 2014, 19 checks made out to defendant and totaling about $7,000 were drawn on the victim's account. Additionally, three checks from the victim's account were used to pay utility bills for several business and personal accounts associated with defendant, in a total sum of about $2,400. Two witnesses testified that defendant had used checks drawn on the victim's account to purchase cars, both of which were nonfunctional sports cars dating from the 1970s; defendant told one of these witnesses that the check had come from his sister.
Several witnesses described deterioration in the victim's behavior and appearance beginning in 2011 or 2012. In September 2012, defendant told the manager of the victim's trailer park that the victim "was getting forgetful and . . . had the onset of dementia." The manager testified that the victim made many late payments in 2011 and 2012, after having paid her rent on time for many years. The manager noticed changes in the victim in September 2012, saying that she had lost weight, become frail and fragile, and spoke very softly. The victim's neighbor testified that, sometime in 2012, she noticed that the victim's behavior was becoming more eccentric. She appeared outdoors in dirty, inadequate or inappropriate clothing, seemed to be losing weight, and was hungry. She sometimes asked the neighbor for food, and ate very large portions of what the neighbor provided. The neighbor called Adult Protective Services (hereinafter APS) twice to report her concerns, once in August 2013 and again on a later date.
APS caseworkers testified that they received community referrals about the victim in August 2013 and February 2014, and that they visited her property and also spoke with defendant several times. On their first visit in August 2013, the victim was thin, unkempt and "looked hungry." She was slow in answering questions and appeared to lose her train of thought. The victim identified defendant as her caretaker, and did not accept the caseworkers' offer of services. APS caseworkers returned to her home in September, October and November 2013. Initially the victim refused to speak with them; on the third visit, she spoke with a caseworker, who observed that her appearance and ability to complete thoughts and finish sentences had deteriorated since August 2013. The victim refused to let caseworkers enter her home, but, in December 2013, she agreed to meet at defendant's garage. The victim was neatly dressed at this meeting and better able to communicate than she had been during the prior encounters. Defendant was present, confirmed that he was responsible for the victim's care, and told the caseworker that he was handling her checking account because she had been carrying around large sums of cash.
In late February 2014, caseworkers observed that the victim's appearance had worsened and that she "had a hard time answering . . . questions." As they stepped just inside her trailer, they were able to see debris in nearby rooms. In March 2014, no one answered the door, and police were called for a welfare check. The next day, police and caseworkers arrived at the victim's home for the welfare check and found her locked inside the trailer and unable to open the door, which she was trying to unlock with a plastic water bottle cap. The door was forced open, and an order was obtained for the victim's transportation to a hospital. A state trooper spoke with defendant, who said that he had taken over the victim's checking account because she seemed to be getting dementia, that he had also taken her car keys, and that he was not aware of her medical treatment.
A State Police investigator and an APS caseworker inspected and photographed the victim's home. They found extremely dirty and unhealthy conditions, including a nonfunctional toilet, foul odors, no running water, no refrigerator and deep piles of papers and debris covering the furniture and the floor. The investigator also discovered certain irregularities in the victim's bank records. In August 2014, he interviewed defendant, who said that he had removed the victim's refrigerator because she left rotting food inside and that he had been helping the victim clean the trailer, could not remember the last time he had been inside, and did not realize how bad the bathroom had gotten. Defendant then terminated the interview by requesting a lawyer; he was subsequently arrested and charged.
Both the People and defendant introduced expert medical testimony regarding the victim's mental condition. The People's expert described his examination and opined that she was likely suffering from Alzheimer's dementia, although vascular dementia was a differential diagnosis; defendant's expert reviewed records and opined that she suffered from vascular dementia.[FN3] Defendant asserts that this diagnosis supported his assertion that she had "good days and bad days" and, thus, his claim that she signed the checks on her "good days."
Defendant's employee, who first met the victim in 2013, testified that the victim spent almost every day at defendant's garage. He said that he and defendant often took the victim to restaurants and diners to get food and that defendant paid for what she ordered. The employee said that the victim had some bad days when she had brief periods of confusion or memory loss, but more often she had good days with no problems at all. In March 2014, the employee noticed that her condition had deteriorated and the bad days outnumbered the good.
Defendant testified that he had known the victim for 40 years. He acknowledged having written the disputed checks that the victim had signed, claiming that she had consented to the expenditures as reimbursements for funds he had spent for her benefit. According to defendant, the victim had bad days, when she was able to recognize him but had memory problems, and good days, when she had no difficulties. In late 2013 or early 2014, the bad days began to outnumber the good. He stated that he and the victim had an unwritten agreement by which she reimbursed him approximately $420 each month for his expenditures for gas and restaurant meals on her behalf. He asserted that the payments for his personal and business utility bills were reimbursements for oil that he had bought for the victim's trailer, and that other checks were reimbursements for his expenses in renovating a basement apartment in his mother's home that he was preparing as a new home for the victim. He submitted photographs of two partly-furnished basement rooms, but provided no receipts for these or any of the other claimed expenditures. He asserted that he had purchased the sports cars as investments on the victim's behalf, while acknowledging that neither car had been resold by the time of trial, more than two years after the victim was placed in the nursing home. He described a new toilet purchased with the victim's funds but never installed, and a trailer that he had purchased to store the victim's belongings. He acknowledged that he had never received the trailer, and had never refunded the money to the victim's account.
We reject defendant's contention that the People did not disprove the defense of good faith claim of right because they did not produce medical evidence establishing that the victim lacked capacity to consent to defendant's use of her funds. The People were not required to prove lack of capacity, which is not an element of larceny in the third degree. Likewise, the victim's mental state was not relevant to the defense of good faith claim of right. That defense depended upon defendant's state of mind — that is, "whether . . . defendant had a subjective, good faith belief that he . . . had a claim of right to the [victim's funds]," thus negating any larcenous intent (People v Rios, 107 AD3d 1379, 1382 [2013] [internal quotation marks, brackets and citation omitted], lv denied 22 NY3d 1158 [2014]). Specifically, the central issue was whether defendant believed in good faith that the victim had consented, and had the capacity to consent, to his use of her funds. This determination was, in essence, a credibility assessment for the factfinder, to which this Court defers (see generally People v Brousseau, 149 AD3d 1275, 1276 [2017]). "Larcenous intent is rarely susceptible of proof by direct evidence, and must usually be inferred from the circumstances surrounding the defendant's actions" (People v Shortell, 173 AD3d 1364, 1365 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 937 [2019]; see People v Brown, 107 AD3d 1145, 1146 [2013], lv denied 22 NY3d 1039 [2013]). Here, the factual circumstances — such as defendant's repeated acknowledgments as early as 2012 that he knew that the victim was suffering from memory loss and dementia, the deplorable condition of her home, his failure to resell the cars that he ostensibly bought for her benefit, and the contrast between his claim that he was spending substantial sums on food for the victim and the evidence that she was hungry and losing weight — support an inference of his larcenous intent and undermine his claim of right. Accordingly, we find the evidence legally sufficient to establish that defendant acted with larcenous intent, and that a reasonable factfinder could find that the People proved beyond a reasonable doubt that he did not act under a good faith claim of right. Further, the verdict was not against the weight of the evidence (see People v Brown, 107 AD3d at 1146-1147; People v Lowins, 71 AD3d 1194, 1196-1197 [2010]; compare People v Michaels, 132 AD3d at 1076-1077; People v Rios, 107 AD3d at 1382).
Defendant next contends that County Court should have granted his motion to set aside the verdict pursuant to CPL 330.30 (1) based on allegedly improper questioning by the court. After defendant completed his testimony, the court directed counsel to return after a lunch break for motions and summations. Upon counsel's return, the court asked defense counsel whether he had any more witnesses, and counsel responded that he did not. The court then stated, "I am loathe[] to engage in any direct or cross-examination on bench trials. It's the role of the attorneys, I believe, to try their case as they see appropriate and deem appropriate, but I have some questions I have to ask [defendant]." The court then called defendant to the stand and asked him a series of questions confirming his previous testimony that the money he expended from the victim's account was reimbursement for sums he had spent for her benefit. The court asked defendant about the October 2015 letter in which defense counsel had claimed that defendant owned funds in the victim's account. In response to these inquiries, defendant confirmed that he had been ordered to pay child support for a child he had not fathered, that he had deposited funds into the victim's account to avoid this improper obligation, and that he thus owned funds in the victim's account. The court asked why defendant did not testify to these facts during the trial, and he responded that he "didn't even think of it" and "didn't recall it." The court then asked how he could have forgotten these facts when he was being charged with stealing, and defendant again responded, in effect, that his memory had lapsed.
In his motion pursuant to CPL 330.30 (1), defense counsel argued that County Court had deprived counsel of the opportunity to offer input by failing to inform him of its intentions before recalling defendant to the stand, and had then improperly assumed the role of an advocate by cross-examining defendant. "A court may not assume the advocacy role traditionally reserved for counsel, but is permitted to raise matters on its own initiative in order to elicit significant facts, clarify or enlighten an issue or to facilitate the orderly and expeditious progress of the trial" (People v Vazquez, 145 AD3d 1268, 1271 [2016] [internal quotation marks, ellipsis and citations omitted]; see People v Arnold, 98 NY2d 63, 67 [2002]; People v De Jesus, 42 NY2d 519, 523 [1977]). As a threshold matter, relief pursuant to CPL 330.30 "is limited to issues that have been preserved and require reversal as a matter of law" (People v Morris, 140 AD3d 1472, 1473 [2016], lv denied 28 NY3d 1074 [2016]; see People v Waheed, 176 AD3d 1510, 1510-1511 [2019], lv denied 34 NY3d 1133 [2020]; People v Howard, 134 AD3d 1153, 1158 [2018], lv denied 27 NY3d 965 [2016]; People v Du Boulay, 140 AD2d 707, 708 [1988]). Here, defense counsel asked to be heard after the court completed its questioning, and advised that defendant's choice of defense had been made in privileged attorney-client communications — but he neither made any express objection to the court's questioning nor raised the issues later asserted in his CPL 330.30 motion.
To the extent that counsel's remarks may be construed as an objection preserving any of defendant's current claims, we find that these claims have no merit. Most significantly, the record makes clear that County Court did not intend to rely on evidence related to its questioning in reaching its verdict. The court denied the People's request to admit the October 2015 letter and the victim's purported written statement as evidence-in-chief, stating that these documents were not part of the proof. In a bench trial, we may presume that the trial court will "mak[e] an objective determination based upon appropriate legal criteria, despite awareness of facts which cannot properly be relied upon in making the decision" (People v Moreno, 70 NY2d 403, 406 [1987] [internal quotation marks and citation omitted]; accord People v Pabon, 28 NY3d 147, 157 [2016]). Further, although the court's final questions about defendant's failure to testify about owning the funds were ill-advised, the initial questions were limited to confirming and clarifying defendant's testimony and claims and, thus, were not improper.[FN4] Finally, a primary reason for prohibiting judicial advocacy is to ensure that a "[t]rial [j]udge's conduct . . . does not divert or itself become an irrelevant subject of the jury's focus" (People v De Jesus, 42 NY2d at 523; see People v Jamison, 47 NY2d 882, 883-884 [1979]). In this bench trial, there was no risk of such improper influence (see People v Byrd, 152 AD3d 984, 988 [2017]; see also People v Arce-Santiago, 154 AD3d 1172, 1174 [2017], lv denied 30 NY3d 1113 [2018]). Accordingly, viewing the record in its totality, we find no evidence that County Court was biased against defendant or that he was deprived of a fair trial by the court's relatively brief questioning (see People v Byrd, 152 AD3d at 988; see also People v Arce-Santiago, 154 AD3d at 1174; People v Lupo, 92 AD3d 1136, 1138 [2012]).
Finally, County Court properly denied defendant's motion to set aside the verdict pursuant to CPL 330.30 (3) on the basis of newly discovered evidence. "In order to prevail on such a motion, it must appear, [among other things], that the newly discovered evidence is of such a nature that a different verdict probably would occur and, further, such proof must not be cumulative or merely impeaching or contradicting of the trial evidence" (People v Hayes, 295 AD2d 751, 752 [2002] [citations omitted], lv denied 98 NY2d 730 [2002]). In a victim impact statement prepared in March 2017 in preparation for defendant's sentencing, an APS caseworker who had not testified at trial stated that the victim then "ha[d] no understanding of anything," but, earlier in her nursing home placement, had periods of lucidity in which she expressed fury over what defendant had done. Defendant contends that the People should have provided him with these notes, asserting that evidence of these periods of lucidity would have supported his claim that she previously had the capacity to consent to his use of her funds. We disagree. This evidence was cumulative to other evidence admitted at trial that the victim had good days and bad days, including that of defendant's witnesses as well as the testimony that the victim was better able to communicate in December 2013 than she had been in previous encounters. Moreover, the evidence was of questionable materiality; as previously noted, the question of defendant's larcenous intent did not turn on the victim's capacity to consent. We find no probability that the verdict would have been more favorable to defendant if the evidence had been received (see CPL 330.30 [3]; People v Smith, 177 AD3d 1190, 1192 [2019], lv denied 34 NY3d 1163 [2020]; People v Paulk, 107 AD3d 1413, 1415 [2013], lv denied 21 NY3d 1076 [2013]).
Egan Jr., Mulvey, Devine and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: County Court announced its decision granting the People's motion during an unrecorded conference, and no written decision was issued. The parties agree, however, that the court's decision was based upon its conclusion that the statement was inadmissible hearsay. As the parties' motion submissions are in the record, we reject the People's assertion that the record is "bereft of material evidence sufficient to permit appellate review of this claim" (People v McLean, 59 AD3d 861, 864 [2009], affd 15 NY3d 117 [2010]).

Footnote 2: The credit union employee who assisted the victim in closing the account described her as disheveled, anxious and very upset.

Footnote 3: A 2012 hospital discharge summary included in medical records reviewed by the People's expert described the victim as "severely demented."

Footnote 4: We disagree with defendant's claim that County Court should have notified counsel and provided an opportunity to offer input before it recalled defendant to the stand. Unlike People v Arnold (98 NY2d at 68-69), on which defendant relies, the court did not call a new witness whose testimony neither party had chosen to present. "There is no absolute bar to a trial court . . . recalling a witness to the stand" (id. at 67-68), and we have never required a trial court to give advance notice to counsel before it questions a witness who has already taken the stand (see e.g. People v Lupo, 92 AD3d 1136, 1138 [2012]).