================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 17
The People &c.,
                    Respondent,
            v.
Christopher A. Nicholson, &c.,
                    Appellant.


            Mary P. Davison, for appellant.
            Geoffrey A. Kaeuper, for respondent.


RIVERA, J.:

        In this appeal we clarify that the Appellate Division

does not exceed its statutory authority or run afoul of our

- 1 -

decisions in People v LaFontaine (92 NY2d 470 [1998]) and People
v Concepcion (17 NY3d 192 [2011]), when it relies on the record
to discern the unarticulated predicate for the trial court's
evidentiary ruling.  On the merits, we reject defendant's claim
that the trial court committed reversible error by admitting
rebuttal testimony intended to provide evidence of defendant's
sole witness's bias or motive to fabricate.  We further reject
his challenges to several other trial court evidentiary rulings,
as well as his assertion that his trial counsel was ineffective.
Therefore, the Appellate Division order should be affirmed.


                              I.

        Defendant, Christopher Nicholson, challenges his
conviction, after a jury trial, on one count of course of sexual
conduct against a child in the first degree (Penal Law § 130.75
[1]), arising from his sexual abuse of his daughter, D.N.  The
evidence at trial demonstrated that defendant and his first wife
have two children, D.N. and a son, who is 18 month's D.N.'s
senior.  After defendant and his wife separated in 1995, D.N.'s
mother had physical custody of the children and defendant had
regular visitation at his home.  D.N., who was sixteen years old
at the time of trial, testified that commencing in 1998 when she
was six years old, and until she turned eight, her father
repeatedly raped her.

        Over defense counsel's objection the court permitted

D.N. to testify about defendant's violent nonsexual conduct towards her and her brother, ostensibly for purposes of explaining why D.N. delayed reporting the sexual abuse. The court also permitted D.N.'s mother to testify about certain aspects of these incidents. According to this testimony, in 1998, D.N. was in kindergarten and defendant would often pick up the children from a school they attended near his residence. One day in April, defendant arrived at the childrens' school enraged over some confusion regarding who would pick them up that day. Defendant entered the principal's office where the children were waiting, grabbed the children by the neck and pulled them out of the school. During the drive back to his home defendant smacked D.N. across the face and punched her brother. D.N. testified that she felt afraid because she thought that defendant's rage "would be so bad that maybe one day he would kill us."

Mother testified that after learning about this incident, she called the police and got a temporary no-contact order against defendant from Family Court. However, she eventually permitted the children to resume visitation with defendant.

D.N. and her mother both testified to another violent incident involving defendant's son on October 1, 1998. D.N. stated that on that day defendant threw her brother and his clothes out of defendant's home, and left him waiting in the rain for mother to pick him up. Describing what precipitated the

ejection from defendant's residence, D.N. testified that
defendant beat and hit her brother before throwing him out
because he stood up for his mother against defendant's verbal
negative statements about her.  Following this incident, D.N.'s
brother never again visited defendant's home.

However, D.N. continued to visit defendant and, at his
request, on occasion stayed overnight.  While she did not
generally remember details of the several sexual assaults, she
testified to two in particular, including the first, which
occurred on Halloween of 1998 when she was in the first grade.
On that day defendant had forbid D.N. to go trick or treating
with the family, and told her to stay home and help with a party
he was planning.  D.N. acquiesced because she was afraid of
defendant.  After D.N. finished helping with the party set up she
went to her room upstairs and read until she fell asleep.  After
the party ended, D.N. woke up to defendant yelling for her.  She
went downstairs and found herself alone with defendant.  He then
started hitting her in the face and pulling her by her arms.
D.N. testified that defendant was incoherent and very angry, and
she felt "very fearful" after he hit her because she "didn't know
what was going to happen next."

Defendant slammed D.N. onto the living room floor and
proceeded to rape her.  Afterwards, D.N. was in extreme pain and
when defendant stopped she ran back to her room and hid under the
bed, where she fell asleep until the following day when she went

back to her mother's home. D.N. testified that at the time she did not tell her mother about the first rape because she was afraid defendant would hurt or sexually abuse her, or fulfill threats he made to kill her mother.

D.N. described another rape which she remembered because it occurred on New Year's Eve, 1999.  On that night, defendant left D.N. alone while he went to a bar with friends. When he returned he called for her, and she came downstairs.  She was frightened by the look in his eyes, and believed he was going to hurt her so she tried to run away, but he caught up with her, grabbed her and tackled her as she entered the living room. Defendant then proceeded to rape her, and afterwards left her on the floor and went upstairs.  D.N. did not call her mother because she "was told not to."  She further testified that she did not tell anyone about the rape the next day "because I figured it would keep continuing and there was nothing that I could do about it" and because she wanted to make sure her mother would not get hurt.  In response to the prosecutor's question as to why D.N. did not tell her mother about what was going on in general, D.N. answered that she stayed silent because she believed defendant when he "continuously threatened me and said that he would kill my mother and make me watch."  She further testified that she "felt like [she] could not overcome" the fear he had instilled in her.

Defendant continued to rape D.N. throughout her first,

second and third grade years, and up until a few weeks before her

eighth birthday.  At trial she testified that she told her mother

at that time

> "that I didn't want anything to do with my
> father anymore because I was tired of him
> hitting me and being mean to me and I just
> wanted to be home with mommy and my brother."

Although D.N. wanted no contact with defendant, he called

constantly wanting to know why she no longer visited him.

In 2008, when D.N. was in the 11th grade, she disclosed

the sexual abuse to her school counselor.  She testified that she

waited to reveal the abuse even after she lived with her mother,

and no longer saw defendant, because she was afraid he would come

after her and her other family.  D.N. explained that she

eventually decided to come forward because she wanted to protect

her younger sister from defendant doing the same to her, she

"wanted people to know the truth . . . so that he can't go and do

it to someone else," and because she wanted someone to help her

keep from killing herself.

Prior to this disclosure, D.N. was extremely depressed

and suicidal.  Unable to deal with the pain inside and the lies

she told about how no one ever hurt her, she began to medicate

and self mutilate by cutting herself with razors and knives.

After she told the counselor, D.N. received psychiatric inpatient

services.

The People also presented expert testimony from a

social worker on Child Sexual Abuse Accommodation Syndrome
(CSAAS).  The expert testified that it is very common for child
victims of sexual abuse to delay disclosure because they believe
that they are to blame for the abuse, or that their silence
protects other individuals from the consequences of the
disclosure.  He also testified that children who have been abused
can have difficulty remembering specific details due to
disassociation, where the child attempts to "not remember" the
traumatic event.

After the People rested, defendant called as his sole
witness his former girlfriend, Marincic.  She testified that they
were romantically involved from 1995 until around 2003 or 2004,
and that they lived together in a house her father helped them
purchase in 1998.  This was the house where D.N. stayed when she
visited defendant.  Marincic further testified that from 1998 to
2000 she never witnessed or heard any violence against D.N.
during her stays at the house.

On cross examination, Marincic claimed that since her
break up with defendant she had not been romantically involved
with him.  She admitted that she visited him in jail up to four
times a month, that he called her from jail at least once a week,
and discussed the trial with her.  She further admitted that she
has a friend relationship with defendant, cares about him, and
did not want him to go to jail.  In addition, she acknowledged
that although she knew about the charges, she did not go to the

police and tell them she was present in the house at the times
the sexual abuse allegedly occurred.  She also stated that she
and defendant broke up because she cheated on him and that after
their break up he began a relationship with his future second
wife, who at the time of trial he had recently divorced.

The prosecutor then elicited the following testimony,

> "Prosecutor: And that's when you came back
> into the Defendant's life, correct?
>
> Witness:   No. I had always been friends with
> him all along, even when he was married with
> her. We are still friends, but that's it.
>
> Prosecutor: And you are friends of the nature
> where you go and visit him in jail; isn't
> that correct?
>
> Witness.  Yes, I'll visit him."

Afterwards, the prosecutor sought to call defendant's
second ex-wife as a rebuttal witness.  The court permitted the
witness over defense counsel's objection based on the following
colloquy,

> "Court: [Prosecutor], what is the expectation
> regarding the testimony.
>
> Prosecutor: The witness testified
> specifically she has been friends with the
> Defendant the entire time, including the time
> after she broke up with him, and he was with
> [rebuttal witness] up to the present date, I
> am calling the [rebuttal] witness to rebut
> that statement that they were friends this
> entire time, because that's not correct.
>
> Court: That is the limited purpose, that they
> were or were not friends during that period;

is that you are saying?

Prosecutor: That's right.

Defense Counsel: So we are clear, she is not asking whether this witness and [defendant] were friends.

Court: I understand.

Defense Counsel: She is trying to rebut the assertion by Ms. Marincic that [defendant] and Ms. Marincic were friends.

Court: That's correct. If this witness has information regarding that limited testimony, it is proper rebuttal.

Defense Counsel: Except it is not relevant, Again, it's a collateral matter. Whether or not they [were] friends after 2003 is collateral to the issues that we have at hand here. It becomes irrelevant and distracting at this point. If that's the sole purpose of calling a witness to say that in her opinion they weren't still friends, these other two people weren't still friends, how is that relevant to the testimony we just heard? That is the one and only purpose they are calling her for, and the Court is allowing it for what purpose?

Court: During what period of time?

Defense Counsel: That would have to be from 2003 on.

Court: Why?

Defense Counsel: Which is almost three years after any allegations that are before this jury to consider.

Court: Does the testimony postdate the time period involved?

Prosecutor: Yes, your Honor, but I was asking this witness about her present relationship with the Defendant, and she indicated that she has been friends with him since that time

period to the present date.

Court: And the rebuttal witness will controvert; that is what you are saying?
Prosecutor: Yes, Your Honor.

Court: Supposedly

Prosecutor: Yes

Court: Then it is proper rebuttal. This is brought out on the Defendant's case. It is proper rebuttal, again, limited to that narrow scope of testimony. Is that the sole purpose of the witness?

Prosecutor: Yes, Your Honor.

Court: A11 right. I understand your argument, [defense counsel], but I don't agree with it so long as that is the offer of proof regarding the proposed testimony. Have the jury enter."

The People's rebuttal witness testified that she was previously married to defendant, but they were now divorced, and she had met defendant after he broke up with Marincic. She further testified that Marincic and defendant spoke at the beginning of her own relationship with defendant but, to the best of her knowledge, such contact ceased when she expressed her displeasure to defendant. The rebuttal witness also attempted to testify that Marincic had sought to "get back" with defendant, but those questions were objected to and the answers stricken from the record.

The jury returned a guilty verdict on the sole count of sexual conduct against a child in the first degree. The court originally sentenced defendant to an indeterminate term of 11 to

22 years incarceration, but upon resentence reduced the term to a determinate 16 years followed by five years of post-release supervision.

The Appellate Division affirmed as modified in a 3-2 decision (118 AD3d 1423 [4th Dept 2014]).[1]  The Court rejected defendant's claims that the trial court should have precluded evidence of prior bad acts, that testimony regarding CSAAS was irrelevant and unnecessary, and that his trial counsel was ineffective.  A majority of the court also concluded that the trial court properly granted the People's request to present evidence that the defense witness lied about her friendship with defendant because such proof was relevant to her bias or motive to fabricate.  The dissenting justices would have reversed and granted a new trial based on the trial court's error in allowing the People to call a witness to testify solely about collateral matters (id. at 1426-1427).  A Justice of the Appellate Division granted defendant leave to appeal.  We now affirm.

II.

Defendant raises the same claims of trial court error that he asserted unsuccessfully before the Appellate Division. For the reasons discussed below we hold these claims, to the extent preserved, to be without merit.

---

[1] The Appellate Division affirmed defendant's separate appeals from his original conviction and the resentence. The current appeal is from the affirmed judgement on his conviction.

### A.   Appellate Division Authority under CPL 470.15

Defendant contends that the Appellate Division exceeded its authority under CPL 470.15 (1), and violated the rule set forth in this Court's holdings in LaFontaine and Concepcion, because the court based its decision that the People's rebuttal witness testimony was admissible on a ground different from that of the trial court.  According to defendant, the trial court's sole basis for permitting the rebuttal testimony was for the limited purpose of establishing that Marincic lied when she testified that she was friends with defendant, during the time he was married to his second wife, up until the time of trial. He complains that the Appellate Division affirmed on the wholly separate ground that the rebuttal testimony permitted an inference of Marincic's bias or motive to fabricate.  The People respond that the rule in LaFontaine and Concepcion is not implicated here because the Appellate Division did not render its decision on an "entirely distinct alternative ground" from the trial court.  Rather, both courts rejected defense counsel's argument that the rebuttal evidence was collateral.

Under CPL 470.15 (1), "[u]pon an appeal to an intermediate appellate court from a judgment, sentence or order of a criminal court, such intermediate appellate court may consider and determine any question of law or issue of fact involving error or defect in the criminal court proceedings which may have adversely affected the appellant" (CPL 470.15 [1]).

This provision is "a legislative restriction on the Appellate Division's power to review issues either decided in an appellant's favor, or not ruled upon, by the trial court" (LaFontaine, 92 NY2d at 474 [internal citations omitted]).  Thus, CPL 470.15 (1) "bars [the Appellate Division] from affirming a judgment, sentence or order on a ground not decided *adversely* to the appellant by the trial court" (Concepcion, 17 NY3d at 195 [emphasis original]).  Such a restriction applies in equal force to this Court which itself has "no broader review powers" (id. citing CPL 470.35 [1]).

Defendant relies on a flawed and overly narrow construction of the statutory limits of 470.15 (1) as applied to the Appellate Division's review of the trial court's evidentiary ruling.  The record indicates the trial court determined that testimony in contravention of the defense witness's statement that she was defendant's friend was admissible as "proper rebuttal."  Defendant's challenge to that ruling required the Appellate Division to consider whether the People's articulated purpose -- to establish the lack of a friendship relationship -- was permissible given defendant's testimony.  Defendant argues that the People sought only to demonstrate that the defense witness lied, which constituted a collateral matter.  Defendant is, of course, correct that the People sought to present evidence that the defense witness was not telling the truth about her relationship with defendant.  However, the Appellate Division's

review of defendant's challenge required that it do more than
recognize the obvious.  The Appellate Division had to determine
whether the purported lie had a particular meaning given the
defense witness's testimony on direct and cross examination.

Where a trial court does not identify the predicate for
its ruling, the Appellate Division acts appropriately in
considering the import of the trial judge's stated reasoning.
Moreover, nothing in the language of CPL 470.15 (1), or this
Court's construction of that provision as discussed in LaFontaine
and Concepcion, prohibits an appellate court from considering the
record and the proffer colloquy with counsel to understand the
context of the trial court's ultimate determination, as it did in
defendant's case.  Unlike the case where the Appellate Division
renders a decision on grounds explicitly different from those of
the trial court, or on grounds that were clearly resolved in a
defendant's favor--the type of appellate overreaching prohibited
by CPL 470.15 (1) (see Concepcion, 17 NY3d at 195), the
Appellate Division here affirmed the evidentiary ruling on the
ground relied on by the trial court, namely to establish the
defense witness lied that she and defendant were merely friends,
as well as the unspoken, record-supported inferences that can be
drawn from that testimony.  We therefore conclude that the
Appellate Division acted within its statutory appellate review
power.

Any other interpretation of CPL 470.15 (1) would

require a trial judge to state every analytic step underlying a determination to admit or deny evidence, no matter how obvious the reasoning from the record. This approach demands a heretofore unexpected level of descriptive technical exactitude. It would require the judiciary to participate in a laborious exercise, without obvious commensurate benefit to the parties or our system of justice. We do not mean that a trial court's evidentiary rulings may go unexplained, that the Appellate Division may hypothesize the basis for a judge's determination where a record is wholly devoid of reason, or that an appellate court may comb through the entirety of a record solely to cobble together some theory for the trial court's conclusion. There must be sufficient articulation of a "reviewable predicate" (cf. Concepcion, 17 NY3d at 195, citing LaFontaine, 92 NY2d at 472 [Appellate Division may consider "only reviewable predicates" for the lower court's decision]). Thus, where the trial court's decision is fully articulated the Appellate Division's review is limited to those grounds, but where the trial court gives a reason and there is record support for inferences to be drawn from that reason, the Appellate Division does not act beyond the parameters legislatively set forth in CPL 470.15 (1) when it considers those inferences.

Defendant argues, in the alternative, that even if the Appellate Division acted within the proper scope of its authority, there is no basis for the inference that the rebuttal

testimony was intended to demonstrate Marincic's romantic involvement with defendant.  On cross-examination, the prosecutor elicited testimony from Marincic that while defendant was in jail she visited him almost once a week, and initially spoke with him daily by telephone, although she claimed that over time the conversations became less frequent and occurred weekly.  She also admitted that she spoke with him about the case, knew about the charges against him, and admitted that she cared for him.  This testimony suggested that her interest in defendant was more than platonic and that they had a close and intimate relationship. Nevertheless, the prosecutor's pointed question about whether Marincic reentered defendant's life upon his divorce, eventually led to her testimony that she was friends with defendant all along, even when he was married, and that they were friends at the time of trial "but that's it."  The People's proffer in support of the rebuttal testimony that she was not a friend thus aligned with the prosecutor's cross examination that sought to demonstrate that defense witness and defendant were romantically involved.

Moreover, apart from the potential bias suggested by Marincic's admission that she was defendant's friend and that she cared for him, the People had much to gain by presenting evidence that permitted an inference of a romantic relationship between defendant and Marincic.  In other words, by demonstrating that Marincic was intentionally mischaracterizing her relationship

with defendant, the prosecutor could argue that she harbored a bias more significant than a friendship, and one that would lead to fabrication of testimony under oath.

The Appellate Division's conclusion that this inference was appropriate and based on testimony that was "proper rebuttal," has record support.  We therefore have no basis to disturb this determination.

B.  <u>EXPERT TESTIMONY ON CHILD SEXUAL ABUSE ACCOMMODATION</u>
<u>SYNDROME</u>

Defendant claims that the trial court abused its discretion when it permitted testimony from the People's expert on CSAAS.  Defendant's claim is quite limited.  He does not challenge the admissibility of expert testimony on CSAAS as a general matter, that a determination on the admission and scope of such testimony is ultimately within the discretion of the trial court, or the expert qualifications of the People's witness.  Instead, defendant's sole contention is that expert testimony on CSAAS was unnecessary and irrelevant once voir dire demonstrated that the prospective jurors in his case understood the reasons for a child sexual assault victim's delayed disclosure of the perpetrator's acts.  The People argue that the expert testimony admitted in this case is wholly permissible under our case law and nothing in the voir dire indicates otherwise.

Admission of expert testimony is left to the sound

discretion of the trial court and "dependent on whether the

expert testimony 'would help to clarify an issue calling for

professional or technical knowledge, possessed by the expert and

beyond the ken of the typical juror'" (People v Williams, 20 NY3d

579, 583-584 [2013], quoting De Long v County of Erie, 60 NY2d

296, 307 [1983]).  We have previously held that expert testimony

on CSAAS is admissible, like other psychological syndromes,

because it helps to explain victim behavior that might be

puzzling to the jury (id. at 583-584; People v Spicola, 16 NY3d

441, 465 [2011]).  The expert educates the jury on a

scientifically-recognized "pattern of secrecy, helplessness,

entrapment [and] accommodation" experienced by the child victim

(Spicola, 16 NY3d at 453).  This includes assisting the jury to

understand "why a child may wait a long time before reporting the

alleged abuse" (Williams, 20 NY3d at 584, citing Spicola, 16 NY3d

at 466-467), fail to report at all, and deny or recant claims of

sexual assault (Spicola, 16 NY3d at 453-454).  As we recognized

in Spicola, the testimony is properly admitted for the legitimate

purpose to counter an inference that the victim is not credible

(id. at 465).

As the record demonstrates, D.N. disclosed the sexual

assaults 10 years after defendant first raped her in the living

room of his home.  Under our case law, CSAAS expert testimony was

appropriate to assist the jury in assessing D.N.'s credibility by

"explaining victims' subsequent behavior that the factfinder

might not understand, such as why victims may accommodate abusers and why they wait before disclosing the abuse" (Williams, 20 NY3d at 584).  Nevertheless, defendant argues that the voir dire responses demonstrate that the jury did not require expert testimony on the reasons for delayed reporting because a child victim's behavior was apparently within the ken of the jurors in his case.  We reject this claim on multiple grounds.

First, defendant has failed to demonstrate that the members of the empaneled jury actually held an appropriate understanding of this syndrome since not every prospective juror affirmatively responded to questions regarding behavior associated with CSAAS.  Second, there is no consistent juror viewpoint discernable from voir dire.  Those who responded to questioning said that they would not be shocked or surprised by a child's delay in disclosure, and provided a variety of reasons for why they felt this way.  For example, in response to counsel's question, one prospective juror explained delayed disclosure as attributable to a very traumatic experience, another said the victim could have been frightened and embarrassed, and yet another asserted that people express feelings differently.  Given the range of answers, the judge did not abuse his discretion in determining that expert testimony describing a pattern of complex psychological behaviors would provide useful information upon which to judge D.N.'s testimony.

Third, even if responses from certain prospective

jurors appear to reflect a basic appreciation of some of the behaviors described by CSAAS, that does not translate into a high level of comprehension of "the dynamics of sexually and physically abusive relationships within a family" at issue in this case and which are generally not as familiar to the lay juror (People v Taylor, 75 NY2D 277, 288 [1990]). Here, the expert described the five categories of CSAAS and explained why a child victim might delay disclosure of her father's sexual abuse, as well as what might eventually motivate a victim to reveal the abuser's conduct. Furthermore, the expert testified about matters not explored during voir dire, such as "disassociation," whereby the victim disassociates the mind from the experience, which ultimately affects a child victim's recollection of events. Thus, the expert's testimony, grounded in his professional knowledge and training, provided relevant information outside the ken of the jurors and was properly admitted.

C.  EVIDENCE OF PRIOR BAD ACTS

Defendant claims that the trial court erred by admitting, without a limiting instruction, evidence of the defendant's prior bad acts, specifically violent actions observed or experienced by the victim, which the prosecutor argued would explain that she delayed reporting out of fear of defendant's potential violent reaction towards her, her mother, and brother. Generally, "all relevant evidence is admissible unless its

admission violates some exclusionary rule" (People v Scarola, 71 NY2d 769, 777 [1988]). Evidence is considered relevant "if it has any tendency in reason to prove the existence of any material fact" (id.). However, even relevant evidence is not admissible if "its probative value is substantially outweighed by the potential for prejudice" (People v Harris, 26 NY3d 1, 5 [2015] quoting People v Mateo, 2 NY3d 383, 424-425 [2004]).

The record demonstrates that the testimony was relevant to explain the victim's delayed disclosure, and was limited to her personal observations and experiences. Given the trial court's careful balancing of the probative value of the testimony against its potential for prejudice, we hold that there was no abuse of discretion in admitting this evidence.

Defendant's additional claim that the court's failure to provide a limiting instruction to the jury constitutes reversible error is unpreserved because defendant failed to make a specific request for such instruction (People v Becoats, 17 NY3d 643, 650 [2011] ["this Court does not consider claims of error not preserved by appropriate objection in the court of first instance"]). Defendant claims, however, that under People v Payne (3 NY3d 266, 273 [2004]), the issue is properly before us because the trial court had an opportunity to review the issue and understood the need for a curative instruction. Defendant's reliance on Payne is misplaced because in that case the Court held that where the trial court reserves decision on a

defendant's motion to dismiss, the preservation rules do not bar review of defendant's claim. Here, the court did not admit the testimony contingent on its instruction to the jury. Nor did the court otherwise state at any point that it *would* give a limiting instruction. Instead, the judge ruled that he was allowing D.N.'s testimony on the prior bad acts to explain her delayed disclosure, and "if necessary" he could provide an appropriate limiting instruction. Since counsel never asked for such instruction, there was no request for the trial court to reserve judgement on, no claim of trial error for the court to review, and no opportunity for the court to grant the relief sought. Defendant's failure renders his present claims unpreserved.

                              III.

          Defendant asserts numerous complaints about his defense counsel's representation in support of his claim that he was denied a fair trial, under both the federal and state constitution, due to his lawyer's mistakes. The People assert that no errors establish the level of ineffectiveness warranting reversal of defendant's conviction. We agree.

          Under the Federal standard ineffective assistance of counsel requires both that "counsel's performance was deficient" and that the "deficient performance prejudiced the [defendant]" (Strickland v Washington, 466 US 668, 687 [1984]). However, under our State Constitution "[t]he core of the inquiry is

whether defendant received meaningful representation" (People v Benevento, 91 NY2d 708, 712 [1998]).  In making that assessment, the Court must view counsel's performance in its totality (see People v Baldi, 54 NY2d 137, 147 [1981]).  Defendant, of course, bears the burden of establishing his claim that counsel's performance is constitutionally deficient (People v Barboni, 21 NY3d 393, 406 [2013]). Thus, defendant must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged failure (People v Satterfield, 66 NY2d 796, 799-800 [1985]).  However, a reviewing court must be careful not to "second-guess" counsel, or assess counsel's performance "with the clarity of hindsight," effectively substituting its own judgment of the best approach to a given case (Benevento, 91 NY2d at 712).  The test is "reasonable competence, not perfect representation" (People v Modica, 64 NY2d 828, 829 [1985] [internal citations and quotation marks omitted]).

Turning to defendant's specific complaints, defendant alleges that counsel was ineffective for failing to object to evidence of defendant's prior bad acts elicited from the victim's mother, in violation of the court's ruling permitting such testimony solely from the victim.  Defendant complains that the mother testified about the school incident in April and defendant's ouster of their son from his residence in October.  Although the mother's testimony on these matters arguably exceeded the court's ruling, this does not warrant a finding of

ineffectiveness given that the jury heard from D.N. about these two incidents, and the mother's testimony about events on these dates did not relate to the sexual abuse.

Moreover, during defense counsel's summation, he sought to use the mother's testimony to defendant's advantage to support his argument that D.N. lied.  Specifically, counsel reminded the jury that the victim immediately complained to her mother about the April incident, that her mother went to the police about defendant, and that as a consequence D.N. did not have to see defendant for quite some time.  He argued that because D.N. had no difficulty complaining in April and had observed her mother's handling of defendant's conduct at that time, it was not believable that D.N. would feel incapable or fearful of reporting the physical and sexual abuse until years after the fact. Defendant's related complaint that counsel should have requested limiting instructions similarly fails because he has not demonstrated that counsel lacked a strategic use for the testimony.  Thus, these two grounds are insufficient bases to conclude defendant was deprived of meaningful representation (Benevento, 91 NY2d at 712).

Defendant next complains that counsel failed to object to the prosecutor's summation comments which he contends amounted to vouching for the victim's credibility and prosecutorial misconduct.  We reject this claim because although the comments were arguably inappropriate, they were not sufficiently egregious

to warrant reversal for ineffectiveness (see People v Wragg, 26 NY3d 403, 411-412 [summarizing cases where the prosecutor committed reversible error during summation by "making misleading representations about physical evidence, encouraging inferences of guilt based on facts not in evidence, and improperly conveying guilt in uncharged crimes"]).

Defendant also claims that counsel failed to investigate or call an expert to rebut the People's expert witness. According to defendant, counsel should have called a witness to "debunk" the People's expert's theory. However, because this Court has held that CSAAS is recognized within the scientific community and the expert here testified generally about CSAAS, and not about its application to D.N. or her specific allegations of sexual abuse, there is no apparent failure in defense counsel's choice not to call his own expert. To the extent defendant argues CSAAS lacks scientific validity and that counsel should have presented evidence to that effect through a rebuttal expert, or during cross examination of the People's expert, defendant's challenges to counsel's preparedness depend on matters dehors the record and are not reviewable on direct appeal (People v Cass, 18 NY3d 553, 556 [2012]).

Defendant's remaining claims are similarly unreviewable on the record before us. His assertion that counsel failed to properly investigate the case, including failing to subpoena medical records--which the People claim do not exist--relies on

extraneous facts.  Furthermore, defendant's final contention that counsel failed to impeach the victim about the inconsistencies between her trial and her Grand Jury testimonies is not without some significance, but requires consideration of matters outside the record to determine whether this was trial strategy.  For example, counsel could have determined that the jury would treat D.N.'s inconsistencies as an example of understandable memory lapses given the years between the abuse and her testimony, or as an example of the effects of the abuse on her memory and recollection.

In summary, whether considered independently or in combination, none of these complaints about defense counsel's representation support a conclusion that he was ineffective based on the totality of the representation under the State Constitution (Baldi, 54 NY2d at 147).  As a consequence, he also fails to meet the higher threshold for ineffectiveness under the federal standard (People v Caban, 5 NY3d 143, 156 [2005]).

Accordingly, the Appellate Division order should be affirmed.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed.  Opinion by Judge Rivera.  Judges Pigott, Abdus-Salaam, Stein and Fahey concur.  Chief Judge DiFiore and Judge Garcia took no part.

Decided February 18, 2016