People v Franklin (2023 NY Slip Op 02717)

People v Franklin

2023 NY Slip Op 02717

Decided on May 18, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 18, 2023

111985
[*1]The People of the State of New York, Respondent,
v
Ernest F. Franklin II, Appellant.

Calendar Date:March 28, 2023

Before:Garry, P.J., Clark, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Paul J. Connolly, Delmar, for appellant.
Michael D. Ferrarese, District Attorney, Norwich (Bridget Rahilly Steller of New York Prosecutors Training Institute, Inc., Albany, of counsel), for respondent.

Clark, J.
Appeal from a judgment of the County Court of Chenango County (Frank B. Revoir Jr., J.), rendered July 8, 2019, upon a verdict convicting defendant of the crimes of murder in the second degree, arson in the third degree and tampering with physical evidence.
At 1:14 a.m. on March 1, 2017, neighbors in the hamlet of Mount Upton, located in the Town of Guilford, Chenango County, reported a fire raging at a double-wide trailer (hereinafter the house) owned by defendant and his wife (hereinafter the wife). After the fire was extinguished, firefighters recovered the badly burned body of defendant's and the wife's 16-year-old adopted son (hereinafter the victim). Defendant and the wife were thereafter separately indicted and charged with murder in the second degree, arson in the third degree and tampering with physical evidence. The People theorized that defendant, acting in concert with the wife, had killed the victim and then started the fire to conceal the murder. Following a jury trial, defendant was found guilty as charged. Defendant was then sentenced to prison terms of 21 years to life on the conviction of murder in the second degree, 5 to 15 years on the conviction of arson in the third degree and 1&frac13; to 4 years on the conviction of tampering with physical evidence, with all three sentences to run concurrently.[FN1] Defendant appeals.
Initially, although defendant moved to dismiss the indictment at the close of the People's case, such motion was not premised on the specific grounds upon which defendant now relies and, as such, his challenge to the legal sufficiency of the evidence is unpreserved (see People v Doane, 212 AD3d 875, 876 [3d Dept 2023]; People v Logan, 198 AD3d 1181, 1182-1183 [3d Dept 2021], lv denied 37 NY3d 1162 [2022]). "Nevertheless, in the course of reviewing [a] defendant's challenge that the verdict as to all counts is against the weight of the evidence, we necessarily evaluate whether all elements of the charged crimes were proven beyond a reasonable doubt" (People v Stover, 178 AD3d 1138, 1139 n 1 [3d Dept 2019] [internal quotation marks and citation omitted], lv denied 34 NY3d 1163 [2020]; see People v Race, 78 AD3d 1217, 1219 [3d Dept 2010], lv denied 16 NY3d 835 [2011]). "In conducting a weight of the evidence review, we must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Barzee, 190 AD3d 1016, 1017-1018 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 36 NY3d 1094 [2021]; see People v Martinez, 166 AD3d 1292, 1293 [3d Dept 2018], lv denied 32 NY3d 1207 [2019]).
As relevant here, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he[*2][or she] causes the death of such person or of a third person" (Penal Law § 125. 25 [1]). Further, "[a] person is guilty of arson in the third degree when he [or she] intentionally damages a building . . . by starting a fire or causing an explosion" (Penal Law § 150.10 [1]). Finally, "[a] person is guilty of tampering with physical evidence when[,] . . . [b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he [or she] suppresses it by any act of concealment, alteration or destruction, or by employing force" (Penal Law § 215.40 [2]).
At trial, the victim's pediatrician testified that he began treating the victim in March 2012 and last examined him in December 2016. The pediatrician testified that the victim was deaf and mute, and that he was diagnosed with nocturnal enuresis (i.e., nighttime bed wetting). Although the victim was born with a ventricular septal defect — a small hole in a heart ventricle — he underwent a minor procedure, continued to be monitored by a cardiologist, and had no physical limitations related to that condition.
Defendant's sister (hereinafter the sister) testified that, while defendant, the wife and the victim appeared to be a happy family in public, defendant and the wife privately treated the victim poorly. In the months leading up to the fire, the sister learned that the wife was pregnant, and the sister observed defendant and the wife becoming increasingly frustrated and burdened by the victim. While the victim had some behavioral issues, such as urinating throughout the house, the sister felt that his punishments — which included forcing the victim to stand in a corner for several hours at a time — were too harsh. The sister visited the house the day before the fire and agreed to a suggestion by defendant and the wife that the victim go live with her; they then expressed that the victim was a rotten child whom the sister would just bring right back. The sister testified that a few days after the victim's death, defendant lamented the loss of the $2,000 per month adoption subsidy.
Two of defendant's neighbors testified that defendant complained about the victim's behavioral issues, primarily that the victim would urinate on the walls of his bedroom, on an electric heater, in the kitchen and in various places throughout the house. In the hours following the fire, defendant went to the neighbors' home, where they observed that defendant's clothes — which included a light-colored gray shirt — were clean and that he did not have any dirt, soot, cuts or burns on his person. Although they knew defendant to be generally quiet and even-keeled, they found it odd that he showed no emotion at all having just lost his son. Both neighbors were also aware that the wife did not have a driver's license, so one of them was surprised to see the wife arrive at the house driving defendant's truck while [*3]the fire roared.
Dustin Smietana, a sergeant with the Chenango County Sheriff's office, and his partner were the first to arrive at the house around 1:25 a.m. on March 1, 2017. He testified that as he climbed defendant's steep unpaved driveway, he spotted defendant's silhouette in the shadows and, after asking if anyone was in the house, he learned that the victim was still inside. At that point, Smietana turned on his body camera and began recording. Smietana explained that the house was burning from the south end, and that he began assessing the structure starting at the southern end of the house. Smietana testified that defendant made no effort to redirect Smietana to the victim's bedroom window, which was located near the northwest corner of the house. When Smietana expressly asked defendant which window led to the victim's bedroom, defendant led Smietana to the northwest corner and pointed down the west side of the house, which led Smietana to believe the victim's bedroom was toward the southern section of the house, where the fire roared. Smietana observed that defendant's clothes were clean and he did not have any injuries or soot on him that would indicate that he had gotten near the fire. Further, Smietana noted that defendant was extremely calm and that he never asked either him or the firefighters to save the victim.
Gregory Peck, a firefighter captain with the Sidney Fire Department, arrived at the scene with the first fire engine. Peck said that when he asked defendant to show him the victim's window, defendant, calmly and without rush, guided Peck to the northwestern corner of the house and told him that the victim's window was "right where the fire [is] now." Peck asserted that defendant's statement misdirected him toward the southwest portion of the house, which was on fire. He noted that if he had known that the victim's bedroom was located at the first window from the northwest corner — a section of the house that was not yet on fire — he would have been able to enter the house and recover the victim before the fire entered that room. Once the fire was extinguished, Peck assisted in removing the victim's body, which had been found lying on its left side atop a burned-out mattress.
Kevin Powell, who at the time of the fire was a detective with the Chenango County Sheriff's office, took a written statement from defendant around 2:45 a.m., and that statement was admitted into evidence. Defendant asserted that he and the wife watched a movie that ended around 10:30 p.m., after which the wife went to Walmart to get some medicine. Defendant said that he then lit a fire in the wood stove and went to do some chores pertaining to various animals they kept on the property, and his two dogs got out and ran off. At that point, he spent 20 to 25 minutes doing chores and another 20 to 25 minutes fetching the dogs, who had run off to a neighboring property. When he returned, he saw a large fire raging through the walls of the southern end [*4]of the house. He explained that he threw a rock through the victim's bedroom window to try to save him, but the fire was too hot, so he ran to the neighbors' home and asked them to call 911. Powell observed that defendant had no soot or other visible fire marks on his person.
Kavin Winton, a fire investigator, reviewed defendant's statement to Powell and then interviewed defendant around 5:15 a.m. on March 1, 2017. Defendant described the victim as four feet, nine inches tall and weighing 80 pounds, and he provided Winton a timeline similar to his earlier statement; Winton noted that the timeline did not account for approximately an hour and 50 minutes before the 911 call. Defendant also asserted that he may have left the gate of the wood stove open. According to Winton, defendant stated that when he returned from fetching the dogs, he saw a fire he described as small and localized on the floor in the living room — a vastly different description from his earlier statement. Winton also found it curious that defendant could not recall the name of the movie that he and the wife had watched just hours before. During a second interview around 7:35 a.m., defendant said that the movie may have ended at 11:00 p.m., still leaving a time gap of about an hour and 20 minutes. While investigating the fire, Winton noted that, although defendant apparently had multiple cats and two dogs, there were no pet remains found in the rubble. Winton testified that his investigation led him to rule out a flash fire, and he ruled out the causes of the fire as occurring by natural or accidental means. Rather, he opined that the fire was intentionally set.
A fellow incarcerated individual (hereinafter the informant) testified that he and defendant had been incarcerated together from August 2017 to May 2018, and that they had developed a friendship. The informant asserted that defendant had asked him to look at the victim's autopsy report and then began sharing details about the case. According to the informant, defendant had complained about how much of a burden the victim had become for him and the wife, and defendant admitted that he had begun to devise a plan to kill the victim. The informant said that defendant reported that an idea materialized while watching the movie "Manchester by the Sea" with the wife on February 28, 2017, and that when he discussed the idea with her, he learned that she also wanted the victim dead. Defendant then told the wife to leave the house to buy some medication to minimize the information she could provide to investigators. The informant admitted that he was receiving a huge benefit for testifying, in the form of a significant sentence reduction for charges that were then pending against him, but asserted that he was being truthful.
Gary Miller, a detective with the Chenango County Sheriff's office, interviewed defendant on March 21, 2017, and noted various inconsistencies in defendant's version of events on the night of the fire. For [*5]example, defendant claimed that, upon discovering the fire, he had broken and cleared the victim's window and reached in and shaken the victim's bed. While the body camera video shows a small hole in the victim's window, the window had not been cleared. A video of the two-hour interrogation of defendant was played for the jury. Miller also described part of the plot of "Manchester by the Sea," which revolved around a father who neglected to close the gate of a fireplace, accidentally starting a fire that killed his two children, and a clip of the movie was admitted into evidence and published to the jury.
A. Wesley Jones, the chief 911 dispatcher with the Chenango County Sheriff's office, received GPS coordinates tracked by a GPS device in defendant's truck, and he prepared a map of the trajectory driven by the wife the night of the fire. The wife left the house at 11:18 p.m. on February 28, 2017 and traveled to the Walmart in the City of Norwich, Chenango County before returning to the house at 12:42 a.m. on March 1, 2017. The truck idled at the bottom of the driveway until 12:46 a.m., when the wife left again, traveling first to the Price Chopper in the Village of Sidney, Delaware County, then back to the Norwich Walmart, ultimately returning to the house at 2:18 a.m. During those three hours, Jones noted, the wife took indirect routes and traveled a total of 87 miles. Surveillance videos admitted into evidence depict the wife at both stores, traveling through various aisles and buying a wide range of items at each location.
James Terzian, a forensic pathologist, conducted an autopsy of the victim and reviewed the victim's medical records to determine "the cause, the mechanism and the manner of death." Because the victim's body was badly burned — his abdomen had been burned through and his internal organs were exposed — Terzian was unable to determine the cause of death. However, he explained, the victim's low carboxyhemoglobin levels [FN2] and the fact that the victim's tongue, larynx and bronchi were "pink and smooth" led him to conclude that the victim was already dead when the fire started. When confronted with the cyanide found in the victim's blood, Terzian theorized that the victim's exposed tissue may have absorbed cyanide gas that had been emitted during the fire. Although such measurement was more commonly found when fire victims breathe in fire byproducts, he noted that the cyanide levels found in the victim's blood were not sufficient to be lethal. Ultimately, Terzian concluded that the victim did not die due to natural causes, health issues or the consumption of drugs. Rather, he opined, to a reasonable degree of medical certainty, that the victim was killed before the fire started.
Suzanne Donovan, a respiratory therapist, conducted an initial test of the victim's blood for the carboxyhemoglobin levels, and the low result led her to conclude that the victim likely died before the fire.[FN3] Edward Barbieri, a forensic toxicologist, tested [*6]the blood for, among other things, carboxyhemoglobin and cyanide. He explained that the carboxyhemoglobin levels were below a threshold set by his lab, such that they reported it as a negative result. Further, because cyanide is a byproduct of burning various plastics, it is common to find it in the blood of fire victims. However, the levels of cyanide found in the victim's blood were below a lethal level. Taking the various lab results into consideration, Barbieri opined that the victim was dead before the fire started.
Upon the conclusion of the People's case, defendant proffered the testimony of three of his friends who asserted that, during their interactions with defendant's family, they did not observe anything that would lead them to believe that defendant or the wife were abusing, or were burdened by, the victim. Jeanne Beno, a retired forensic toxicologist, testified regarding studies demonstrating the possibility of cyanide gas reaching and killing a person during a fire before the person's carboxyhemoglobin levels could become elevated. However, she admitted that those studies centered around "flash fire[s]" and that she was unaware whether those studies examined whether the deceased's respiratory system had been charred or damaged by the fires. Although she said it was possible that the cyanide levels could have caused the victim's death during the fire, she was unable to state, to a reasonable degree of scientific certainty, that the victim was alive when the fire started.
Having reviewed all of the trial evidence and testimony, a different verdict would not have been unreasonable. Considering the circumstantial nature of the proof, the jury could have believed defendant's witnesses, discounting his motive to kill the victim and raising questions regarding whether the fire was an accident that led to the unfortunate death of the victim. However, the jury was presented with conflicting evidence and reached a different conclusion. Defendant's varying explanations for his conduct upon discovering the fire, including alleged attempts to save the victim, were contradicted by the body camera footage and the various witnesses observing defendant's clean clothing. The jury also observed defendant's laissez-faire attitude while the house burned with the victim inside, and they heard him misdirect Peck about the location of the victim's bedroom. Although the informant had an extensive criminal history and admitted that his testimony would earn him leniency, his testimony is not rendered "incredible as a matter of law but, rather, raises an issue of credibility for the factfinder to resolve" (People v Portee, 56 AD3d 947, 949 [3d Dept 2008], lv denied 12 NY3d 820 [2009]; see People v Young, 190 AD3d 1087, 1092 [3d Dept 2021], lv denied 36 NY3d 1102 [2021]). The verdict reveals that the jury may have believed the informant's testimony, which provided context to the wife's circuitous driving the night of the fire. Further, the informant shed light [*7]on defendant's alleged lack of memory about which movie he and the wife had watched.
We also defer to the jury's resolution of credibility issues among the experts who testified (see People v Barreto, 64 AD3d 1046, 1048 [3d Dept 2009], lv denied 13 NY3d 834 [2009]). To that end, Terzian opined, based upon his expertise and relying on his autopsy and the various lab results, that the victim was dead prior to the fire, while Beno was unable to assert a professional opinion about the timing of the victim's death relative to the fire. Considering the weight of all of the evidence presented at trial, we find that the weight of the evidence established that "defendant intended to and caused the death of the victim[]," thereby supporting his conviction for murder in the second degree (People v Slocum, 178 AD3d 1131, 1134 [3d Dept 2019], lv denied 35 NY3d 944 [2020]; see People v Wlasiuk, 136 AD3d 1101, 1102-1103 [3d Dept 2016], lv denied 27 NY3d 1009 [2016]). Similarly, considering Winton's professional opinion that the fire was intentionally set, defendant's demonstrably false versions of events and the informant's testimony that defendant had developed his plan while watching "Manchester by the Sea," we also conclude that the jury reasonably determined that defendant set fire to the house in order to destroy evidence of his murder of the victim, thereby supporting his convictions for arson in the third degree and tampering with physical evidence (see People v Rahaman, 189 AD3d 1709, 1712 [3d Dept 2020], lv denied 36 NY3d 1059 [2021]; People v Slocum, 178 AD3d at 1134).[FN4]
Next, defendant argues that County Court erred in granting the People's for-cause challenge to a hearing-impaired prospective juror. To the extent that defendant preserved this issue, we note that the decision of whether a prospective juror is qualified to serve "must be left largely to the discretion of the trial court, which can question and observe the prospective juror during the voir dire" (People v Guay, 18 NY3d 16, 22 [2011] [internal quotation marks, ellipsis and citation omitted]). Here, the prospective juror expressed that he could only hear about half of the things being said, and he asked for the lawyers to stand close to him and look directly at him while speaking, so that he could hear better. After placing its observations on the record, County Court excused the juror, and we cannot say that doing so was an abuse of its discretion (see id. at 23; compare People v Guzman, 76 NY2d 1, 7 [1990]).
Further, defendant's arguments that he received ineffective assistance of counsel are meritless. Defendant did not demonstrate that counsel's failure to object to Donovan's comment that "this poor child was dead before the fire" lacked any strategic or other legitimate explanation (see People v Nicholson, 26 NY3d 813, 831 [2016]; People v Lekovic, 200 AD3d 1501, 1505 [3d Dept 2021], lv denied 38 NY3d 1008 [2022]). Further, to the extent that counsel failed to provide a specific [*8]objection to the disqualification of the hearing-impaired prospective juror, we note that failure to lodge an objection that had little to no chance of success does not constitute ineffective assistance of counsel (see People v Bateman, 212 AD3d 993, 997 [3d Dept 2023], lv denied ___ NY3d ___ [Apr. 26, 2023]; People v Calafell, 211 AD3d 1114, 1120 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]). In reviewing the record, counsel set forth a clear and concise defense strategy, successfully limited various aspects of the People's proof, vigorously cross-examined the People's witnesses and presented cogent opening and closing statements. Viewing counsel's representation in its totality, defendant received meaningful representation (see People v Vasquez, 210 AD3d 1302, 1306 [3d Dept 2022], lv denied 39 NY3d 1080 [2023]; People v Casalino, 204 AD3d 1078, 1082 [3d Dept 2022], lv denied 38 NY3d 1070 [2022]).
We also reject defendant's contention that his sentence on the murder conviction is harsh and excessive. Although he has a limited criminal history and a low risk of recidivism, the killing of the victim was heinous and cruel. Defendant also took extraordinary steps to cover up the killing, placing emergency personnel at risk, and he has not accepted responsibility or shown remorse for his actions (see People v Bateman, 212 AD3d at 998; People v Lee, 183 AD3d 1183, 1191 [3d Dept 2020], lv denied 35 NY3d 1114 [2020]; People v Benson, 119 AD3d 1145, 1148-1149 [3d Dept 2014], lv denied 24 NY3d 1118 [2015]). We also note that, although County Court could have made the murder conviction consecutive to the convictions for arson and tampering with evidence (see People v Franklin, 207 AD3d 963, 963-964 [3d Dept 2022]; People v Slocum, 178 AD3d at 1135), the court ordered the sentences on all three convictions to run concurrently. Under these circumstances, we decline to reduce his sentence.
Defendant's remaining contentions, to the extent not expressly addressed herein, lack merit.
Garry, P.J., Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Following defendant's sentencing, the wife pleaded guilty to manslaughter in the first degree, arson in the third degree and tampering with physical evidence and, on appeal, we affirmed her judgment of conviction (People v Franklin, 207 AD3d 963 [3d Dept 2022]).

Footnote 2: Terzian explained that carboxyhemoglobin can reveal the amount of carbon monoxide inhaled by a victim during a fire.

Footnote 3: Contrary to defendant's assertion, Donovan did not testify as to the time of death.

Footnote 4: To the extent that defendant challenges the sufficiency of the evidence presented before the grand jury, such challenge is precluded by our finding that the verdict is supported by the weight of the evidence, which necessarily means that the verdict is supported by legally sufficient evidence (see CPL 210.30 [6]; People v Gaston, 147 AD3d 1219, 1220 n 2 [3d Dept 2017]). "Our review of the minutes does not reveal any other errors in presenting the case to the grand jury that impaired the integrity of the proceeding or caused prejudice to defendant so as to warrant the drastic remedy of reversal" (People v Stover, 178 AD3d at 1144 n 4 [internal quotation marks and citations omitted]; see CPL 210.35 [5]; People v Mitchell, 55 AD3d 1048, 1050 [3d Dept 2008], lv denied 12 NY3d 856 [2009]).