People v Colvin (2023 NY Slip Op 03948)

People v Colvin

2023 NY Slip Op 03948

Decided on July 27, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 27, 2023

111840 
[*1]The People of the State of New York, Respondent,
v
Carla Colvin, Appellant.

Calendar Date:June 6, 2023

Before:Egan Jr., J.P., Aarons, Ceresia, Fisher and McShan, JJ.

John A. Cirando, Syracuse, for appellant.
William G. Gabor, District Attorney, Wampsville (J. Scott Porter of counsel), for respondent.

Egan Jr., J.P.
Appeal from a judgment of the County Court of Madison County (Patrick J. O'Sullivan, J.), rendered May 6, 2019, upon a verdict convicting defendant of the crimes of criminal trespass in the second degree, petit larceny and criminal possession of stolen property in the fifth degree.
At 5:19 a.m. on December 15, 2017, Kristen Nestor called 911 to report that a home invasion robbery had occurred at the apartment in the Village of Cazenovia, Madison County, where she was staying as a guest of the tenant, Gabriel Beltran. Responding officers arrived to find Beltran sitting in pain and reporting that he had been struck in the head with an aluminum baseball bat, as well as damage to the back door of his second-floor apartment. The officers learned that a man and a woman were involved in the break-in, and the man was identified as Adam Warner. Neither Nestor nor Beltran knew who the woman was, but Nestor described her as having long hair tied in a bun and wearing a Realtree-style camouflage hoodie. Nestor added that the pair had taken her purse.
Meanwhile, a state trooper who had heard the initial report of the incident, as well as the identification of Warner as a suspect, was heading toward Cazenovia on U.S. Route 20 when he observed a yellow Jeep travelling in the opposite direction at 67 miles per hour in a 45 mile-per-hour zone. The trooper turned to follow the Jeep, which left U.S. Route 20 and began traveling on local roads. Before the trooper could catch up to the Jeep, the driver lost control on a sharp corner and went into a ditch. When the trooper arrived, he found the Jeep in the ditch and two sets of footprints in the snow leading away from it. He radioed for assistance and stayed with the Jeep, during which time he looked through the vehicle's window and saw a baseball bat in the back seat and a purse on the passenger side front seat. Other officers soon arrived and were standing about a quarter of a mile away from the Jeep when they saw defendant, wearing a camouflage hoodie, walking toward them with her hands up. Warner, in turn, was found hiding in a nearby camper. Defendant was transported back to the crime scene and shown to Nestor, who identified her as the woman who had entered the apartment. Subsequently, the baseball bat and the purse, as well as a passport and other items belonging to Nestor that had been in the purse and were strewn on the passenger seat near it, were recovered from the Jeep.
In June 2018, an indictment was handed up charging defendant with two counts of burglary in the first degree, burglary in the second degree, robbery in the first degree, two counts of robbery in the second degree, attempted petit larceny relating to Beltran, and both petit larceny and criminal possession of stolen property in the fifth degree relating to Nestor's purse.[FN1] Following an unsuccessful motion by defendant to suppress the showup identification of her by Nestor on the ground that it was was unduly suggestive, the matter proceeded [*2]to a jury trial. At the conclusion of that trial, defendant was convicted of criminal trespass in the second degree as a lesser included offense of a burglary count, as well as petit larceny and criminal possession of stolen property in the fifth degree relating to the theft of Nestor's purse. She was acquitted of all other charges. County Court sentenced defendant to concurrent terms of three years of probation on each conviction and directed that she pay restitution in the amount of $1,326.58, representing the amount Beltran was charged by his landlord for repairing the damage caused to his apartment during the incident. Defendant appeals.
We affirm. Defendant's challenge to the legal sufficiency of the evidence is unpreserved because, among other things, she failed to renew her trial motion to dismiss at the conclusion of her case (see People v Truitt, 213 AD3d 1145, 1146 [3d Dept 2023], lv denied 39 NY3d 1144 [2023]; People v Kerrick, 206 AD3d 1268, 1269 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]). Her further "argument that the verdict is against the weight of the evidence does not require preservation, however, and obliges this Court to assess whether each element of the crimes for which [she] was convicted was proven beyond a reasonable doubt" (People v Diaz, 213 AD3d 979, 980 [3d Dept 2023], lv denied ___ NY3d ___ [June 30, 2023]; see People v Danielson, 9 NY3d 342, 348-349 [2007]; People v Franklin, 216 AD3d 1304, 1305 [3d Dept 2023]). We therefore turn to that argument, which requires us to "view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v McCoy, 169 AD3d 1260, 1261-1262 [3d Dept 2019] [internal quotation marks and citations omitted], lv denied 33 NY3d 1033 [2019]; see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Franklin, 216 AD3d at 1306). As relevant here, "[a] person is guilty of criminal trespass in the second degree when . . . he or she knowingly enter or remains unlawfully in a dwelling" (Penal Law § 140.15 [1]). "A person is guilty of petit larceny when he [or she] steals property" (Penal Law § 155.25), and further commits "criminal possession of stolen property in the fifth degree when he [or she] knowingly possesses stolen property, with intent to benefit himself [or herself] or a person other than an owner thereof or to impede the recovery by an owner thereof" (Penal Law § 165.40).
The trial evidence left no doubt that defendant was with Warner in the leadup to the incident and that she had entered Beltran's apartment while it was underway; the question was the degree to which she was a knowing participant in the break-in and the theft and retention of Nestor's purloined purse. In that regard, the testimony [*3]of Beltran and Nestor reflected that they were lying in bed around 4:30 a.m. on the morning of the incident when they heard a crashing noise or glass shattering toward the rear of the apartment. Beltran got up to investigate and, as he was walking toward the kitchen in the back of the apartment, encountered an uninvited Warner standing alone in the living room with an aluminum baseball bat. Warner asked where "the stuff" was and demanded Beltran's money and valuables, prompting Beltran, who was hoping to retrieve his own baseball bat from the kitchen, to say that he had "something for" Warner and begin heading in that direction. Beltran first saw a woman that he identified as defendant when the two men reached the kitchen, where she stepped out of the way and Warner hit Beltran in the head with the bat. Beltran stated that defendant and Warner then left the kitchen separately. Beltran did not see where defendant went, but did see Warner threaten Nestor with the baseball bat, after which he saw the two walk into the living room and Warner demand money and drugs. Nestor, in response, gave Warner her purse. Beltran testified that he went onto the back porch shortly afterward and observed Warner standing below him on the lower level of the porch and defendant running across the parking lot with the purse.
Nestor testified to a similar sequence of events, stating that she stayed in the bedroom while Beltran investigated the noise at the back of the apartment and that she heard a male demanding "all the drugs and money." Soon after, Warner walked into the bedroom holding a baseball bat and repeatedly demanded drugs and money from Nestor. Nestor told him several times that she did not have drugs or money and, during that period, the woman Nestor identified as defendant entered the bedroom and put her arm out toward Warner. Nestor then offered to give Warner her purse, which was in the adjoining living room and was "the best that [she] could do." She did not know where defendant was at that point; she did recall walking out into the living room with Warner and retrieving her purse, at which point Warner ripped it out of her hands and fled through the back door of the apartment. Nestor did not see what happened next.
The People also presented evidence that the baseball bat and purse were subsequently recovered from the yellow Jeep in which Warner and defendant were traveling and that the purse was on the front passenger seat with its contents dumped out, suggesting that one or both of them had been rifling through it. Defendant's sister and brother-in-law further testified that, in a conversation with defendant after the incident, she admitted to having been in the area of the apartment and that she had taken the purse from Warner. Indeed, even defendant acknowledged in her testimony that she entered Beltran's apartment without permission and saw broken glass on the floor by the damaged, open rear door where she did so. There was therefore extensive evidence [*4]reflecting that, even if defendant did not share Warner's intent of breaking into the apartment and robbing its occupants at the time she entered it, she entered the apartment without permission and took Nestor's purse from Warner, and it was readily inferable that she did so despite knowing that it was stolen, given that she watched Warner assault Beltran and interact with Nestor.
The foregoing proof was sufficient to support the jury's verdict in all respects and, to the extent that it left acquittal on any of the charges for which defendant was convicted a reasonable possibility, the jury obviously rejected her implausible testimony in which she claimed that she had no idea what Warner was doing in the apartment and only entered it to investigate the sounds of breaking glass and screaming, denied knowing that it was an apartment, asserted that she never saw the baseball bat Warner used to menace its occupants, and stated that Warner never gave her the purse and kept it on his lap as he was driving the Jeep. After deferring to that assessment of credibility and viewing the evidence in a neutral light, we are satisfied that the verdict is supported by the weight of the evidence in all respects (see People v Saunders, 181 AD3d 1049, 1051 [3d Dept 2020]; People v Carter, 50 AD3d 1318, 1320 [3d Dept 2008], lv denied 10 NY3d 957 [2008]).
Turning to defendant's various evidentiary arguments, she contends that County Court erred in refusing to suppress the showup identification of her by Nestor on the morning of the incident. In that regard, "[a] showup identification is permissible so long as it was reasonable under the circumstances — that is, when conducted in close geographic and temporal proximity to the crime — and the procedure used was not unduly suggestive" (People v Bateman, 124 AD3d 983, 984 [3d Dept 2015] [internal quotation marks and citations omitted], lv denied 25 NY3d 949 [2015]; see People v Brisco, 99 NY2d 596, 597 [2003]; People v Vaughn, 135 AD3d 1158, 1159 [3d Dept 2016], lv denied 27 NY3d 1076 [2016]). The sole witness at the suppression hearing, a police officer with the Village of Cazenovia Police Department, testified that he received the initial report of the incident at approximately 5:20 a.m., arrived at Beltran's apartment a few minutes later and obtained Nestor's description of the female perpetrator. He and other officers were still on the scene an hour later when a radio report advised that defendant had been taken into custody and, 10 to 15 minutes after that, defendant was returned to the scene and shown to Nestor, who immediately identified her as the female perpetrator. These circumstances demonstrated that the showup identification occurred close in location and in time to the crime and, contrary to defendant's contention, "the fact that [she] arrived at the scene in a marked police vehicle and was presented to the victim in handcuffs did not, as a matter of law, render the procedure unduly suggestive" (People [*5]v Harris, 64 AD3d 883, 884 [3d Dept 2009], lv denied 13 NY3d 836 [2009]; see People v Brisco, 99 NY2d at 597; People v Hilton, 166 AD3d 1316, 1320 [3d Dept 2018], lv denied 32 NY3d 1205 [2019]). As such, defendant's efforts to suppress that identification were properly rejected.
County Court also properly rejected defendant's attempt to undermine the testimony of her sister and brother-in-law via testimony from one of her friends regarding the purported contents of letters authored by Warner that allegedly exonerated defendant and that defendant could not produce because they were allegedly stolen from defendant's residence by her sister and brother-in-law. Defendant could and did explore the perceived bias of her relatives via other means and, notwithstanding her efforts to argue otherwise, any testimony from her friend regarding the contents of the purported letters was being offered for the truth of their contents and constituted inadmissible hearsay (see People v Kachadourian, 184 AD3d 1021, 1023 [3d Dept 2020], lv denied 35 NY3d 1113 [2020]; People v Bottomley, 146 AD3d 1026, 1028 [3d Dept 2017], lv denied 29 NY3d 947 [2017]).
Defendant's remaining arguments do not demand extensive discussion. Her contention that the verdict was rendered repugnant by her acquittal on various counts is unpreserved for our review in view of her failure to object to the verdict before the jury was discharged (see People v Satloff, 56 NY2d 745, 746 [1982]; People v Leigh, 208 AD3d 1463, 1465 [3d Dept 2022]; People v Swanson, 43 AD3d 1331, 1331 [4th Dept 2007], lv denied 9 NY3d 1010 [2007]). As for defendant's challenges to the order of restitution, we are satisfied that the damage Warner caused to Beltran's apartment arose out of "the same criminal transaction" that led to the charges for which defendant was convicted, and County Court was accordingly free to order her to pay restitution for that damage (Penal Law § 60.27 [4] [a]; see CPL 40.10 [2]; People v Decker, ___ AD3d ___, ___, 190 NYS3d 485, 486-487 [3d Dept 2023]; People v Stone, 307 AD2d 387, 388-389 [3d Dept 2003], lv denied 100 NY2d 645 [2003]; People v Sheehy, 274 AD2d 844, 845-846 [3d Dept 2000], lv denied 95 NY2d 938 [2000]). Defendant's related contention that she could not be ordered to pay restitution for the damage because she was convicted of those offenses following a jury trial is meritless, as an offense subject to restitution is defined in the disjunctive as the one "for which a defendant was convicted, as well as any other offense that is part of the same criminal transaction or that is contained in any other accusatory instrument disposed of by plea of guilty by the defendant" (Penal Law § 60.27 [4] [a] [emphasis added]; see e.g. People v Coston, 55 AD3d 943, 946-947 [3d Dept 2008], lv denied 11 NY3d 924 [2009]; People v Sheehy, 274 AD2d at 846).
Aarons, Ceresia, Fisher and McShan, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Warner also faced charges as a result of the incident, and the parties stipulated at defendant's trial that he had been convicted of burglary in the second degree.